CONNOR B., by his next friend, Rochelle VIGURS, Adam S., by his next friend, Denise Sullivan, Camila R., by her next friend, Bryan Clauson, Andre S., by his next friend, Julia Pearson, Seth T., by his next friend, Susan Kramer, and Rakeem D., by his next friend, Bryan Clauson, individually and on behalf of all others similarly situated, Plaintiffs,

v.

Deval L. PATRICK, Governor of the Commonwealth of Massachusetts, John Polanowicz, Secretary of the Massachusetts Executive Office of Health and Human Services, and Olga I. Roche, Acting Commissioner of the Massachusetts Department of Children and Families, in their official capacities, Defendants.

Civil Action No. 10–30073–WGY.

United States District Court,
D. Massachusetts.

Nov. 22, 2013.

Daniel J. Gleason, Emily J. Grannon, Jonathan D. Persky, Mary K. Ryan, Nutter, McClennen & Fish, LLP, Boston, MA, Elizabeth Pitman Gretter, Sarah Russo, Laurence D. Borten, Marcia Robinson Lowry, Rachel Brodin Nili, Sara Michelle Bartosz, Children's Rights, New York, NY, for Plaintiffs.

Jeremy D. Bayless, Steven H. Joseph, Office of the Attorney General Martha Coakley, Bryan G. Killian, Massachusetts Attorney General's Office, Robert L. Quinan, Jr., Amy Spector, Jason B. Barshak, Jeffrey T. Collins, Liza J. Tran, Office of the Attorney General, Boston, MA, for Defendants.

*FINDINGS AND RULINGS*

YOUNG, District Judge.

## I. INTRODUCTION

Anonymized minors acting on behalf of a class of approximately 8500 children (collectively, the "Plaintiffs") who, after being removed from their family homes due to abuse or neglect, have suffered harm or are exposed to harm[1] in the custody of the Massachusetts Department of Children and Families ("DCF" or the "Department"), bring this suit under 42 U.S.C. section 1983 against high-level officials in the Commonwealth's administrative bureaucracy (collectively, the "Defendants") for allegedly circumscribing the myriad constitutional and statutory rights of the class members. Specifically, the Plaintiffs contend that the Defendants violated (1) class members' right to substantive due process; (2) class members' constitutionally guaranteed liberty, privacy, and associational interests, particularly the right to familial association; (3) certain provisions of the Adoption Assistance and Child Welfare Act of 1980 ("AACWA"), 42 U.S.C. §§ 670–676, specifically those pertaining to foster care maintenance payments and individualized case plans; and (4) class members' right to procedural due process. The sheer number and breadth of allegations raised by the Plaintiffs in this case effectively amount to an all-out assault on the Massachusetts foster care system, in which the Plaintiffs request all manner of declaratory and injunctive relief. The Defendants, for their part, have moved for judgment on the record.

### A. Procedural Posture[2]

On April 15, 2010, lead plaintiffs Connor B.,[3] Adam S., Camila R., Andre S., Seth T., and Rakeem D. (collectively, the "Named Plaintiffs"), by their next friends and on behalf of all others similarly situated, filed a complaint in this district against Massachusetts Governor Deval Patrick and the heads of the Massachusetts Executive Of-

---

1. August 15, 2012, was set as the fact cutoff date for liability purposes. Elec. Order, May 17, 2012.

2. Children's Rights, one of the Plaintiffs' counsel in this matter, have secured settlements with over a dozen other states in similar foster care management disputes. *See* Susan Ferriss, *Class–Action Suit Challenges Massachusetts Foster Care System*, Center for Pub. Integrity (Jan. 23, 2013, 6:00 AM), http://

www.publicintegrity.org/2013/01/23/12062/ class-action-suitchallenges-massachusetts-foster-care-system. Massachusetts is the first to take up the gauntlet and accept the Plaintiffs' challenge in court. *Id.*

3. Pursuant to Local Rule 5.3(a), pseudonyms have been used to protect the identities of the children who are parties to this class action.

fice of Health & Human Services and DCF. Compl., ECF No. 1. That same day, the Plaintiffs filed a motion to certify a class and appoint class counsel. Pls.' Mot. Class Certification & Appointment Class Counsel, ECF No. 2. The Defendants moved to dismiss the complaint on August 20, 2010, Mot. Hon. Deval L. Patrick Dismiss Compl. Against Him Pursuant Fed. R.Civ.P. 12(b)(1) & 12(b)(6), ECF No. 17; Defs.' Mot. Dismiss Compl. Pursuant Fed.R.Civ.P. 12(b)(1) & 12(b)(6), ECF No. 18, and subsequently filed an opposition to the Plaintiffs' motion for class certification, Defs.' Opp'n Pls.' Mot. Class Certification, ECF No. 32.

Following additional filings by both parties, Judge Michael Ponsor issued a memorandum and order on January 4, 2011, denying the Defendants' motions to dismiss and leaving for later resolution the Plaintiffs' motion for class certification. *Connor B. ex rel. Vigurs v. Patrick*, 771 F.Supp.2d 142 (D.Mass.2011) (Ponsor, J.). Nearly two months later, Judge Ponsor revisited the remaining motion, granting the Plaintiffs class certification and referring the case to Magistrate Judge Kenneth Neiman for further adjudication.[4] Mem. & Order Regarding Pls.' Mot. Certify Class & Appoint Class Counsel, ECF No. 49; Elec. Order, Feb. 28, 2011. The case was eventually reassigned to this Court on November 19, 2012. Elec. Notice, Nov. 19, 2012, ECF No. 203.

On December 3, 2012, the Defendants moved for partial summary judgment on the Plaintiffs' substantive due process count and for full summary judgment on all of the remaining counts in the Plaintiffs' complaint. Defs.' Mot. Partial Summ. J., ECF No. 209. At a motion hearing held on January 10, 2013, the Court denied the Defendants' motion as matter of judicial economy. Elec. Clerk's Notes, Jan. 10, 2013, ECF No. 272. The case proceeded to trial on January 22, 2013. Elec. Clerk's Notes, Jan. 22, 2013, ECF No. 291.

On April 30, 2013, following the close of the Plaintiffs' case-in-chief, the Defendants filed a motion for judgment on the record and appended to their motion a memorandum of law in support. Defs.' Mot. J. R., ECF No. 316; Mem. Law Supp. Defs.' Mot. J.R. ("Defs.' Mem."), ECF No. 317. The Plaintiffs submitted a brief in opposition to the Defendants' motion on May 16, 2013. Pls.' Mem. Law Opp'n Defs.' Mot. J.R. ("Pls.' Opp'n"), ECF No. 356. The motion was heard on May 21, 2013, but the Court declined to rule on it at the hearing, deciding instead to take the matter under advisement and adjourn the case without day. Mot. Hr'g Tr. 37:17–18, May 21, 2013, ECF No. 364.

## B. Child Welfare Regulatory Framework

Under Title IV–E of the Social Security Act,[5] 42 U.S.C. §§ 670–676, the Children's Bureau of the Administration for Children and Families ("ACF"), which sits within the U.S. Department of Health & Human Services ("HHS"), allots federal funds to states to assist in their provision of foster care services. *See* Title IV–E Foster Care, Children's Bureau (May 16, 2012), http://www.acf.hhs.gov/programs/cb/resource/titleive-foster-care. In order to qualify for Title VI–E funds, state foster care agencies must meet a long list of federal requirements. *See* 42 U.S.C. § 671(a).

---

**4.** The Defendants' attempt to decertify the newly constituted class proved equally futile. *See Connor B. ex rel. Vigurs v. Patrick,* 278 F.R.D. 30 (D.Mass.2011) (Ponsor, J.).

**5.** Title IV–E is also known as the Adoption Assistance and Child Welfare Act of 1980. *Henry A. v. Willden,* 678 F.3d 991, 1007 n. 9 (9th Cir.2012).

The receipt of said funds is additionally conditioned upon participation in and the successful completion of Child and Family Services Reviews ("CFSRs"). Trial Ex. 808, Children's Bureau Child & Family Servs. Reviews Fact Sheet ("CFSR Overview") 1. HHS has established seven outcome measures spread across three categories to grade a state agency's performance:

(1) A title IV–E agency's substantial conformity will be determined by its ability to substantially achieve the following child and family service outcomes:

(i) In the area of child safety:

(A) Children are, first and foremost, protected from abuse and neglect; and,

(B) Children are safely maintained in their own homes whenever possible and appropriate;

(ii) In the area of permanency for children:

(A) Children have permanency and stability in their living situations; and

(B) The continuity of family relationships and connections is preserved for children; and

(iii) In the area of child and family well-being:

(A) Families have enhanced capacity to provide for their children's needs;

(B) Children receive appropriate services to meet their educational needs; and

(C) Children receive adequate services to meet their physical and mental health needs.

45 C.F.R. § 1355.34(b)(1). In addition to these seven outcome measures, HHS has adopted six statewide data indicators to assist in determinations of whether a state is in substantial conformity with Title IV–E: (1) the recurrence of maltreatment; (2) the incidence of child abuse and/or neglect in foster care; [6] (3) the number of re-entries into the foster care system; (4) the length of time to achieve reunification; (5) the length of time to achieve adoption; and (6) the stability of foster care placement.[7] *See* Title IV–E Foster Care Eligibility Reviews and Child and Family Services State Plan Reviews, 65 Fed.Reg. 4020, 4024 (Jan. 25, 2000) (codified at 45 C.F.R. pts. 1355–1357); *see also* Admin. Children & Families, U.S. Dep't Health & Human Servs., *Background Paper: Child and Family Services Reviews National Standards* 1 (2012), *available at* http://www.acf.hhs.gov/sites/default/files/cb/cfsr backgroundpaper.pdf.

States that fail to meet the requirements of a CFSR must draft and implement a Program Improvement Plan ("PIP") that establishes performance improvement goals in the areas in which the states are not in substantial conformity with federal standards. *See* CFSR Overview 2. There is great incentive to keep pace with the goals set forth in the PIPs, as states that fail to do so are assessed penalties as punishment for their noncompliance. *See id.*

---

**6.** This indicator has since changed to refer to the *absence* of maltreatment of children in foster care. *See infra* Part II.A.

**7.** The first two statewide indicators pertain to the first safety outcome—namely, that "[c]hildren are, first and foremost, protected from abuse and neglect," 45 C.F.R. § 1355.34(b)(1)(i)(A)—whereas the last four statewide data indicators pertain to the first

permanency outcome—namely, that "[c]hildren have permanency and stability in their living situations," 45 C.F.R. § 1355.34(b)(1)(ii)(A). *See* Title IV–E Foster Care Eligibility Reviews and Child and Family Services State Plan Reviews, 65 Fed.Reg. 4020, 4024 (Jan. 25, 2000) (codified at 45 C.F.R. pts. 1355–1357).

## C. Child Welfare Standards

National child welfare standards established by the Council on Accreditation ("COA") and the Child Welfare League of America ("CWLA") provide the normative backdrop against which DCF's challenged practices and policies must be cast.[8]

COA is an accrediting organization that performs research on best practices in child welfare and sets professional standards for child welfare agencies. *See* Trial Tr. vol. 11, 33:5–9, 33:23–34:1, Feb. 28, 2013, ECF No. 335. COA standards are derived both from the opinions of independent panels (comprised of experts drawn from across the social services spectrum) and from the relevant academic literature. Rule 30(b)(6) Dep. Council Accreditation, Richard Klarberg 37:19–20, 41:20–42:4, Aug. 9, 2012, ECF No. 226–1. Standards that have been transcribed in draft form are then disseminated for comment to individuals who have expertise in the applicable field. *Id.* at 41:14–19, 46:17–22. The comments received are customarily incorporated into existing standard statements and reviewed again by the independent panelists, *id.* at 47:7–12, making the process of COA standard-setting rather iterative and dynamic.

CWLA is a public, non-profit agency that, like COA, conducts best-practices research and sets industry standards for child welfare services. Trial Tr. vol. 11, 33:15–21. CWLA standards are set by a process similar to the one used for the development of COA standards. Rule 30(b)(6) Dep. Child Welfare League Am., Linda Spears 77:12–78–24, Aug. 14, 2012, ECF No. 226–1.

## D. Expert Witness Testimony

Over the course of the bench trial, seven expert witnesses (all for the plaintiff) were called to the stand to testify. The Court takes the time here to provide a brief biography of the witnesses and explain their particular relevance or contribution to the matter under review.

### 1. Named Plaintiff Case File Review

Dr. Lenette Azzi–Lessing ("Dr. Azzi–Lessing") is a tenured associate professor of social work at Wheelock College, located in Boston, Massachusetts. Trial Tr. vol. 3, 103:3–18, Jan. 25, 2013, ECF No. 327. Dr. Azzi–Lessing conducted a review of five of the Named Plaintiffs' DCF case files, which date from the children's entry into the foster care system through early 2012. Trial Tr. vol. 6, 76:5–7, 79:3–10, Feb. 4, 2013, ECF No. 330. The aim of Dr. Azzi–Lessing's case file review was to assess DCF's effectiveness in providing the five Named Plaintiffs with "safety, permanency and well-being." *Id.* at 71:14. In reaching her conclusions, Dr. Azzi–Lessing drew upon COA and CWLA standards, academic literature, federal welfare regulations, internal DCF policies, and her own teaching experiences. *See id.* at 71:9–14, 73:14–74:2.

### 2. Children's Research Center Case File Study

The Children's Research Center ("CRC"), a division within the National Council on Crime & Delinquency, was retained by the Plaintiffs to perform a study of DCF case files to determine whether and the extent to which DCF met prevailing standards of case practice in foster

---

8. Admittedly, neither COA nor CWLA standards impose upon child welfare agencies obligations that have the force of law. *See* Trial Tr. vol. 19, 73:20–75:18, 87:12–25, May 7, 2013, ECF No. 347 (noting that COA and CWLA standards are intended to be viewed aspirationally). Nevertheless, given the standards' widespread usage, this Court elevates them as reflective of the bar to which child welfare agencies are generally expected to measure up.

care. *See* Trial Tr. vol. 4, 4:8–16, 20:15–20, Jan. 30, 2013, ECF No. 328. Dr. Raelene Freitag ("Dr. Freitag"), the director of CRC, managed the study and was a coauthor of the report that contained CRC's findings. *Id.* at 4:12–13, 30:7–15. Dr. Kristen Johnson ("Dr. Johnson"), a senior researcher at NCCD, assisted Dr. Freitag at all stages of the study, performing study and research design, establishing data collection protocols, training case readers, conducting data cleaning and analysis, and co-authoring the CRC report. *See id.* at 22:25–23:2; Trial Tr. vol. 5, 67:22–68:3, 78:1–15, Jan. 31, 2013, ECF No. 329. Dr. Erik Nordheim ("Dr. Nordheim"), a statistics professor at the University of Wisconsin–Madison in Madison, Wisconsin, served as Dr. Johnson's consultant and advised CRC on its study's sample design. *See* Trial Tr. vol. 4, 31:14–32:2; Trial Tr. vol. 6, 33:19–21, 36:5–14.

CRC conducted a longitudinal study that involved an examination of a random and representative sample of 484 DCF case files, equally divided into two cohorts of foster children who were followed for a period of thirty months.[9] *See* Trial Ex. 1066, Compliance Foster Care Case Practice Standards Mass. Dep't Children & Families: Longitudinal Study Two Cohorts ("CRC Study"); Trial Ex. 1065, Compliance Foster Care Case Practice Standards Mass. Dep't Children & Families: Longitudinal Study Two Cohorts app. C ("CRC Study Appendix C"); *see also* Trial Tr. vol. 4, 24:24–25:2, 27:2–4, 31:6–13, 32:12–22; Trial Tr. vol. 5, 84:6–9. The first cohort, labeled the "entry cohort," was comprised of children who had entered the Massachusetts foster care system during the twelve-month window between July 1, 2009, and June 30, 2010. *See*

Trial Tr. vol. 4, 25:6–9. This particular group of foster children was selected for the purpose of assessing current DCF practice for children just entering foster care. *Id.* at 25:9–13. The second cohort, labeled the "two-year cohort," gave CRC a picture of long-term DCF practice, as the cohort consisted of children who had been in foster care for two or more years as of July 1, 2009. *See id.* at 25:14–20, 55:11–12. The CRC study covered a wide range of "key points" in foster care practice, touching upon reunification, permanency, placement stability, maltreatment in care, and family visitation, among other subjects. Trial Tr. vol. 5, 77:13–22.

### 3. Psychotropic Medication Review

Dr. Christopher Bellonci ("Dr. Bellonci") is a board-certified adult and child psychiatrist who presently works as an assistant professor at Tufts University School of Medicine and as an attending psychiatrist at Tufts Medical Center, both of which are located in Boston, Massachusetts. *See* Trial Tr. vol. 1, 111:24–112:3, 119:24–120:3, Jan. 22, 2013, ECF No. 325. The Plaintiffs retained Dr. Bellonci in March 2012 to review three of the Named Plaintiffs' case files and produce a report speaking to the degree to which DCF met the standards governing child welfare practices concerning the administration of psychotropic medication and mental health services. Trial Tr. vol. 2, 36:2–6, 36:21–37:10, 114:13–19, Jan. 24, 2013, ECF No. 326. He paid particular attention to whether DCF obtained informed consent from the relevant parties to whom they were responsible, provided adequate oversight of the psychotropic drug administration process, and had in place an adequate monitoring system. *See id.* at 116:21–117:2. To support his findings, Dr. Bellonci relied upon his

---

9. None of the Named Plaintiffs' case files were among those sampled in the CRC study.

Trial Tr. vol. 4, 28:8–10.

personal experience working with the foster care population and knowledge of other states' foster care systems, academic literature, federal guidelines, and standards set forth by the American Academy of Child and Adolescent Psychiatry ("AACAP"). *See id.* at 38:3–10, 43:11–16, 43:25–44:10, 77:4–13.

#### 4. Management Reviews

Catherine Crabtree ("Crabtree") is a senior project leader at the Center for Government and Public Affairs at Auburn University at Montgomery in Montgomery, Alabama, where she consults with public agencies and non-profit institutions on questions concerning organizational reform and performance management. Trial Tr. vol. 11, 7:19–22, 8:5–12. Crabtree also has an extensive background in child welfare, mental health, and other social services work in Tennessee and Alabama. *See id.* at 10:6–13:1, 14:25–16:7, 16:19–18:15. In the spring of 2012, the Plaintiffs contacted Crabtree to do a management review of the Massachusetts foster care system. *See id.* at 24:3–14. The management review focused on "four critical building blocks" of child welfare agency practice, *id.* at 29:18–19: (1) the number of skilled and trained DCF personnel; (2) the balance of foster care placements and services; (3) the presence of quality assurance systems; and (4) the existence of accountable and stable leadership. *See id.* at 29:15–31:2. In the course of her review,

Crabtree turned to a variety of sources, including state and federal regulations, national professional standards, DCF's internal policies and communications, and deposition testimony. *See id.* at 25:14–26:3.

Arburta Jones ("Jones") boasts a long work history in various positions in the child and social welfare systems in New Jersey. *See* Trial Tr. vol. 8, 115:6–135:1, Feb. 6, 2013, ECF No. 332. The Plaintiffs retained Jones in May 2012 to study issues related to the safety of children in DCF custody who are situated in out-of-home placements. *Id.* at 135:4–14. Jones's review focused on the quality of four "hinge pins" of child welfare, *id.* at 141:16: (1) family visitation; (2) foster home licensing; (3) foster care investigations; and (4) internal and external accountability systems. *Id.* at 141:13–142:1. Jones's analysis depended largely upon the depositions of DCF staff and executives; DCF's internal data, reports, and communications; CWLA and COA standards; data produced by the Massachusetts Office of the Child Advocate (the "OCA"); and state and federal regulations. *Id.* at 135:24–136:11, 138:11–20.

## II. FINDINGS OF FACT [10]

The amount of material that this Court has been called upon to review to inform its findings is, quite frankly, voluminous: over the course of the last nine months, the Court has scrutinized numerous depo-

---

**10.** A motion for judgment on the record, like a motion for judgment on partial pleadings made under Federal Rule of Civil Procedure 52(c) ("Rule 52(c)"), grants a district court occasion to enter judgment for a party prior to the conclusion of a jury-waived trial "[i]f a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue." Fed.R.Civ.P. 52(c). Rule 52(c), however, states that "[a] judgment on partial findings *must* be supported by findings of fact and conclusions of law." *Id.* (emphasis added). The Court bristles at this

requirement, as it effectively gives short shrift to the party that has yet to put on all of its evidence. (Indeed, the Defendants were able to present only two of the fifteen witnesses that they expected to call, so the trial record is likely incomplete. *See* Joint Pretrial Mem., App. B, Defs.' Witness List 2, ECF No. 277–2.) Nevertheless, this Court is hamstrung by its obligation to obey Rule 52(c)'s commandment. It must be understood, then, that these findings may overstate matters in the Plaintiffs' favor even though ultimately they have fallen short.

sitions and party filings, heard twenty-four days of trial testimony,[11] read nearly 3000 pages of trial transcript, and studied just under 1200 trial exhibits (which themselves collectively comprised tens of thousands of pages of documents).[12] Obviously, it would be near impossible to take into consideration every last shred of evidence on every topic broached in this case. Naturally, then, the Court necessarily is selective in its reproduction of the record, condensing the most salient kernels of information and deemphasizing (or altogether omitting) those facts that are not as germane to this Court's conclusions.

## A. Maltreatment in Foster Care

HHS has conducted two rounds of CFSRs, the first spanning the years from 2000 to 2004 and the second spanning the years from 2007 to 2010. *See* Nat'l Conference of State Legislatures, *State Progress Toward Child Welfare Improvement* 2 (2010), *available at* http://www.ncsl.org/documents/cyf/progress-cw-improvement. pdf. For the first-round CFSRs, HHS set the national standard for the acceptable incidence of child abuse or neglect in foster care at 0.57%, meaning that a 0.57% rate of substantiated maltreatment would constitute the seventy-fifth percentile of all states' performance on this statewide data indicator.[13] *See* Trial Ex. 488, Background Paper: Child & Family Servs. Reviews Nat'l Standards 2–3. The first-round CFSR for Massachusetts, completed in 2001, found a 0.85% incidence of child abuse or neglect in 1997 and a 0.94% incidence of child abuse or neglect in 1999, rates that were 0.28 and 0.37 percentage points above the national standard, respectively.[14] Trial Ex. 55, Mass. Statewide Assessment: Mass. Child & Family Servs. Review ("First–Round CFSR Statewide Assessment") CSF–000000425. For the second-round CFSRs, HHS reframed this statewide data indicator as the absence of maltreatment of children in foster care by foster parents or facility staff and pegged the national standard for this new metric at 99.68% [15] (effectively tightening the old standard from 0.57% to 0.32%). *See* The

**11.** Fifty days—twenty for the Plaintiffs' case-in-chief and up to thirty for the Defendants'—had originally been allotted for this trial. Elec. Clerk's Notes, Jan. 16, 2013, ECF No. 278. The Defendants' motion for judgment on the record, however, gave the Court appropriate reason to suspend the proceedings. Defs.' Mot. Directed Verdict, ECF No. 316.

**12.** The Plaintiffs' proposed findings of facts alone, submitted in conjunction with their opposition to the Defendants' motion, measures a prolix 396 pages in length. *See* Pls.' Mem. Law. Opp'n Defs.' Mot. J. Record, Ex. A, Pls.' Proposed Findings Fact, ECF No. 356–1.

**13.** The CFSR implementing regulations set the 75th percentile of the states' performance as "[t]he national standard for each statewide data indicator." Title IV–E Foster Care Eligibility Reviews and Child and Family Services State Plan Reviews, 65 Fed.Reg. 4020, 4024 (Jan. 25, 2000) (codified at 45 C.F.R. pts. 1355–1357).

**14.** Data for 1998 is unavailable because, during that year, the Department was in the process of converting its management information system. *See* Trial Ex. 56, Child & Family Servs. Review: Final Assessment CSF–000000319.

**15.** The second-round CFSR national standard was originally set at 99.67%. The Data Measures, Data Composites, and National Standards to be Used in the Child and Family Services Reviews, Notice, 71 Fed.Reg. 32,969, 32,980 tbl. 1 (June 7, 2006). The standard was raised to its present level after HHS undertook a revision of CFSR standards to bring these measures in line with new data. The Data Measures, Data Composites, and National Standards to be Used in the Child and Family Services Reviews; Corrections, Notice, 72 Fed.Reg. 2881, 2881 (Jan. 23, 2007).

Data Measures, Data Composites, and National Standards to be Used in the Child and Family Services Reviews, Notice, 71 Fed.Reg. 32,969, 32,973 (June 7, 2006); The Data Measures, Data Composites, and National Standards to be Used in the Child and Family Services Reviews; Corrections, Notice, 72 Fed.Reg. 2881, 2886 tbl. A (Jan. 23, 2007). In other words, if 99.68% or more of foster children statewide were not victims of a substantiated or indicated maltreatment, that state would be deemed to have met the national standard. The second-round CFSR for Massachusetts, completed in 2007 and relying in part upon state child welfare data from 2004, 2005, and the first three months of 2006, found a 98.72% absence of child abuse or neglect in the Commonwealth during the time period, 0.37 percentage points below the national standard and marking a decline in performance from the first-round CFSR. *See* Trial Ex. 58, Final Report: Mass. Child & Family Servs. Review ("Second–Round CFSR Final Report") CSF–000000747, CSF–000000750.

Due to its poor performance in the second-round CFSR, Massachusetts submitted a PIP for approval by HHS. *See generally* Trial Ex. 33, Mass. Child & Family Servs. Review Program Improvement Plan. The Department agreed to achieve an improvement goal of 99.03%, *See id.* at 54, but later negotiated a lower improvement goal of 98.8%, Trial Ex. 587, DCF PIP Quarterly Report: Quarter One DCF000063281. DCF met the latter negotiated improvement goal. Trial Ex. 588, DCF PIP Quarterly Report: Quarter Two DCF000554885.

A third-round CFSR, though widely expected, has not yet taken place. *See* Children's Bureau, U.S. Dep't of Health and Human Servs., *Child and Family Services Review: Technical Bulletin # 6* (Feb. 4, 2013), *available at* http://www.acf.hhs.gov/sites/default/files/cb/cfsr—tb6.pdf. That said, HHS's annual publication reporting child maltreatment data serves to fill the gaps for more recent years. This publication provides state-by-state data with respect to the absence of maltreatment in foster care for a given federal fiscal year. *See, e.g.,* Trial Ex. 1088, Child Maltreatment 2010; Trial Ex. 1161, Child Maltreatment 2011. From 2006 to 2011, Massachusetts reported absence of maltreatment rates of 99.05%, 99.14%, 98.93%, 99.16%, 99.22%, and 99.30%, respectively. *See* Child Maltreatment 2010, at 57 tbl. 3–20; Child Maltreatment 2011, at 55 tbl. 3–15. These results, when compared to those of other states, placed the Commonwealth fourth worst out of forty-six reporting states in 2006, the seventh worst out of forty-six reporting states in 2007, the fourth worst out of forty-eight states in 2008, the seventh worst out of forty-nine states in 2009, the eighth worst out of forty-seven states in 2010, and the seventh worst out of forty-nine states in 2011.[16] *See* Child Maltreatment 2010, at 57 tbl. 3–20; Child Maltreatment 2011, at 55 tbl. 3–15.

The CRC longitudinal study also documented rates of alleged abuse or neglect committed against children in the study's entry and two-year cohorts. Among 242 children in the entry cohort, forty-four allegations of abuse or neglect during the DCF observation period were reported. *See* CRC Study tbl. 18. Twelve of these

---

**16.** DCF's own internal data shows that the agency's performance in the area of child maltreatment has slipped since 2011. *See* Trial Ex. 964, Child & Family Servs. Review Measures DCF011097888, DCF011421629

(reporting a 99.2% statewide rate of absence of maltreatment in foster care for the twelve-month periods ending March 31, 2012, and June 30, 2012).

allegations were substantiated, causing children to be removed from their environments in eleven cases.[17] *Id.* This means that roughly 5% of the children in the entry cohort sample population were victims of substantiated abuse or neglect, and that approximately 91.6% of these children were removed from their environments.

The CRC study reported comparable incidence rates for the two-year cohort. Among 242 children in the two-year cohort, fifty-six allegations of abuse or neglect during the DCF observation period were reported. *Id.* tbl. 45. Ten allegations were substantiated, and children were removed from their environment in eight of these cases.[18] *Id.* This means that roughly 4.1% of the children in the two-year cohort sample population were victims of substantiated abuse or neglect during the observation period, and that approximately 80% of these children were removed from their environments.

Statistics on the two-year cohort prior to the observation period are striking. Of 240 children in the two-year cohort, forty-three children were victims of substantiated maltreatment prior to July 2009. *See* CRC Study Appendix C tbl. C59. This means that at the start of the observation period, 17.9% of children in the two-year cohort had already experienced substantiated maltreatment while in DCF custody. In roughly 37.2% of these cases, the children had been substantiated victims between two and nine times. *See id.*

The five Named Plaintiff case files reviewed by Dr. Azzi–Lessing documented egregious instances of maltreatment. For example, at the age of six, Connor B. was placed in a foster home for four to six weeks with a teenager known to be at risk for sexually abusing younger children. *See* Trial Tr. vol. 6, 83:12–22, 84:10–23. He reportedly raped Connor B. repeatedly during the course of his stay. *See id.* at 85:15–23. The teenager was subsequently removed from the foster home, and DCF revoked the foster home's license to host foster children. *Id.* at 115:24–116:13. In the case of Adam S., DCF initially screened out complaints of abuse or neglect that allegedly took place in Adam S.'s adoptive home, which included instances of corporal punishment and force-feeding. *Id.* at 117:9–19. Eventually, a DCF investigator initiated a review of the foster home, which resulted in the removal of certain foster children from the home. *Id.* at 118:18–22. But because the investigator did not provide the remaining children with protective services, Adam S. and his sisters suffered brutal beatings by their adoptive parents until they were ultimately removed from the adoptive home as well. *See id.* at 118:18–120:6. Andre S. and his sister, both under the age of four, resided in an overcrowded foster home with seven other children for over two years. *See* Trial Tr. vol. 7, 28:1–4, 28:13–21, Feb. 5, 2013, ECF No. 331. At a later preadoptive foster placement at their cousin's home, Andre S. and his sister were report-

---

17. Two of these twelve substantiated allegations fall into a subcategory of allegations made specifically against an individual in the foster home. *See* CRC Study tbl. 18. But the data shows that five children in this subcategory were removed from their environments. *See id.* The Court admits its uncertainty as to why more children were removed from their placements than made substantiated allegations in this subcategory, but has no cause to inquire further into this matter.

18. Once again, the Court expresses confusion regarding the reported statistics, this time because the number of sample children removed from their parental homes is greater than the number of substantiated incidents of abuse or neglect in those settings. *See* CRC Study tbl. 45.

edly prompted to engage in sexual acts with one another and to watch the cousin and her boyfriend have sex and take drugs together. *See id.* at 35:14–19, 38:14–22. Andre S.'s sister also reported being raped by the cousin's boyfriend on numerous occasions. *Id.* at 38:23–39:1. The children were eventually removed, and DCF later investigated and substantiated the majority of the reported events. *See id.* at 39:2–9.

Sworn trial testimony provided by Lauren James ("James"), a former ward of DCF custody, also speaks to maltreatment in care. *See* Trial Tr. vol. 1, 28:24–25, 29:25:30–2. James attested to a wide range of negative experiences in foster care, including, among other things, sharing beds with other foster children, *id.* at 32:24–33:1, performing excessive amounts of housework, *id.* at 35:11–36:12, having inadequate food, *id.* at 36:13–37:15, having strained contact with family members, *id.* at 39:17–24, and taking prescribed psychotropic medications beginning at age six or seven, *id.* at 62:8–24.

## B. Family Visits and Placements

The maintenance of family relationships is an issue of key concern for foster care agencies. According to DCF policy, foster children must be given the opportunity to receive their parents and siblings on visits at least once per month. Trial Ex. 1, DCF Case Practice Policy & Procedures Manual DCF POL (7/08) 140. Children taken into foster care custody are also expected to be relocated to a foster home or other placement with or in close proximity to their siblings and other family members, unless the placement would endanger a child's safety. *See* 42 U.S.C. § 671(a)(31)(A); Mass. Gen. Laws ch. 119, § 23(c); 110 Mass.Code Regs. 7.101(1)(b), (e). By natural extension, then, Massachusetts regulations express an unambiguous preference

for placements with relatives, known as "kinship placements," and placements of children into homes in which there are no other foster children, known as "child-specific placements," over other potential arrangements. *See* 110 Mass.Code Regs. 7.101(2)(a)-(b) (listing "placement with a kinship family" and "placement with a child-specific family" atop the hierarchy of possible placement resources). DCF must screen kinship placements and child-specific placements before a foster child is relocated, however, and the Department is statutorily obliged to reassess these placements on an annual basis. 110 Mass.Code Regs. 7.108(1)-(2), 7.113(1).

In its first-round CFSR, Massachusetts's performance in achieving continuity in family and area relationships was found to be in substantial conformity with federal law. Trial Ex. 56, Child & Family Servs. Review: Final Assessment ("First–Round CFSR Final Assessment") CSF–000000331; *see also id.* at CSF–000000331–34 (dubbing as "strengths" Massachusetts's efforts to ensure that children in out-of-home placements remained in close proximity to their former communities, maintained relationships with their families, and were placed in safe homes with relatives). The Commonwealth did not achieve these results in the second round, however. *See* Second–Round CFSR Final Report CSF–000000780–91 (labeling Massachusetts's performance with respect to placements with siblings, kinship placements, and preserving family connections as areas needing improvement). If one were to extrapolate from the results of the CRC study, it would appear that child-family visits are a relatively rare occurrence: only 20.9% and 37.6% of children in the entry cohort received consistent monthly visits from siblings and parents, respectively, for the en-

tirety of the thirty-month review period.[19] CRC Study tbl. 16.

Nor does Massachusetts boast a sterling record with respect to the suitability of placements. Roughly 31.9% of children in DCF custody have been placed outside of their local home area, and some 18.6% of children were placed altogether outside their region of origin,[20] *see* Trial Ex. 418, Proximity Placement Tables 12, which makes visits with family members and caseworkers, commuting to and from school, and attending doctor's appointments more difficult, *see* Trial Tr. vol. 11, 118:2–20. The CRC study found that with respect to sibling placement, 69% of children in the entry cohort with siblings also in foster care were placed with at least one sibling for at least part of their time in care, and 49.5% of children in the entry cohort were placed with all of their siblings for at least part of their time in foster care. *See* CRC Study tbl. 8. The rate of sibling placement for children in the two-year cohort was markedly worse: only 43.9% of children were placed with at least one sibling, and a mere 18.7% of children were placed with all of their siblings. *See id.* tbl. 37. Reasons for the lapses in sibling placements were documented in only 53.8% of cases in the entry cohort and 38.4% of cases in the two-year cohort. CRC Study Appendix C tbl. C28. In addition, children are sometimes removed to kinship and child-specific placements that have not yet received formal authority to operate. *See* Trial Ex. 512, Unapproved Homes Active Placements (reporting the list of unapproved kinship and child-specif-

ic homes in the Boston, Northern, and Southern regions with active placements).

## C. Placement Stability

Placement stability is another goal that often proves elusive in Massachusetts. DCF regularly makes use of a variety of short-term placements. *See, e.g.,* Dep. Joy E. Cochran ("Cochran Dep.") 159:22–160:23, Apr. 13, 2012 (describing DCF's use of night-to-night placements, where foster children are placed for periods of about a week or less and then moved to other locations); Dep. Raymond W. Pillidge ("Pillidge Dep.") 184:17–185:15, Mar. 7, 2012 (describing DCF's use of hotline homes, where foster children may be placed for a few days or a weekend in the event that there is a lack of available foster homes). These short-term placements disrupt the lives of children in care and are often used for purposes other than those for which they were designed. *See, e.g.,* Pls.' Designations Fact Dep. Mary Gambon ("Gambon May Dep.") 165:24–167:17, May 14, 2012, ECF No. 226–1 (confirming former DCF Commissioner Angelo McClain's [21] ("McClain") belief that hotline homes and night-to-night placements are "not good for kids," *id.* at 166:6–7, and agreeing that multiple placements are harmful to foster children, *id.* at 167:13–15); · Pillidge Dep. 184:17–185:1 (agreeing that hotline homes are to be used only for emergency placements after the close of regular business hours); *see also* 110 Mass.Code Regs. 7.101(2)(e) (positioning "placement in a shelter/short term pro-

---

**19.** In fact, only 40.2% of children in the entry cohort were visited by any kin whatsoever in the thirty-month window. CRC Study tbl. 16. This memorandum omits reference to parallel data for the two-year cohort, as certain omissions made the information unhelpful for analytical purposes. *See id.* tbl. 43b.

**20.** These figures are accurate as of March 31, 2012, the latest date for which data has been provided. *See* Trial Ex. 418, Proximity Placement Tables 12.

**21.** Commissioner McClain succeeded Commissioner Harry Spence, presently the Administrator of the Massachusetts Trial Court.

gram or group home" on a lower rung of a prioritized list of placement options).

Additional problems are posed by DCF's reliance on Stabilization, Assessment and Rapid Reintegration ("STARR") facilities and Intensive Foster Care ("IFC") placements. STARR facilities are intended to be used as "up–to–45–day placement[s] for children or youth who may be coming into the department's care or custody . . . [and who may warrant] a period of more intensive assessment and stabilization before determining the next appropriate level of care." Pls.' Designations Rule 30(b)(6) Dep. Robert E. Wentworth, Jr. Re: Purchased Servs. Licensing, Delivery, & Oversight 13:2–8, Dec. 29, 2011, ECF No. 226–1. Likewise, IFC programs "provide therapeutic services and supports in a family-based placement setting to children and youth [who] . . . are transitioning from a residential/group home level of care . . . or discharging from a hospital setting." Trial Ex. 385, Intensive Foster Care Scope Serv. DCF000465967. Due to a lack of available foster homes, however, foster children are frequently moved into STARR facilities and IFC placements even when they do not meet the eligibility criteria for entering such placements. *See* Trial Ex. 407, Email Frances Carbone to Perry Trilling & Amy Kershaw DCF003355182 (conveying a DCF's employee stated reasons for using STARR facilities, including "provid[ing] quick family treatment sometimes to diffuse the situation so that the child can return home"); Gambon May Dep. 213:9–17 (describing DCF's practice of "hoteling," which refers to the assignment of a foster child to an IFC placement even if the child does not exhibit the requisite behavior or medical conditions that would qualify her for the placement). In certain instances, children remain in these facilities for longer than is recommended. *See, e.g.,* Trial Ex. 673, N. Regional Office—Apr. 2011, at 1 (revealing that twenty-one children in DCF's Northern Region remained in a STARR facility for longer than the prescribed forty-five-day period).

These persistent placement problems can primarily be traced to a single root cause: there is a severe shortage in the number of foster homes in Massachusetts. DCF's general goal is to maintain a pool of around 4000 unrestricted homes for foster care placements, *see* Pls.' Designations Rule 30(b)(6) Dep. Mary Gambon Re: Recruitment & Retention Foster Homes ("Gambon Oct. Dep.") 94:12–95:12, Oct. 18, 2011, ECF No. 226–1, but the Department has fallen short of that target since the late 1990s, Trial Ex. 955, DCF Quarterly Reports, 2008–2012, Tab Q3 2012, at 62 fig. 28. Staffing shortfalls contribute substantially to the drag in foster home recruitment. *See,* e.g., Gambon Oct. Dep. 50:9–51:7 (explaining that four additional statewide recruiters would be necessary in order to fulfill DCF's recruitment objectives); *cf.,* e.g., *id.* at 17:14–18 (certifying that DCF's central office in Boston has only four employees dedicated, and only in part, to the recruitment of foster homes).

What's more, neither bolstering the administrative ranks nor obtaining the requisite number of foster homes will resolve the ongoing placement challenges related to ensuring a child's unique fit with a prospective placement, a consideration which rightly figures prominently in placement decisions. *See* Gambon Oct. Dep. 96:20–97:14 ("At any point in time, when you look at the number of homes that [DCF] ha[s] . . . you'll have sometimes upwards of 1,000, 1,500 homes without placements . . . . [I]t's all about matching the right home. . . . [W]e're looking at are we able to bring in homes that can take sibling groups, are we able to bring in homes that can take certain types of behavior? Are we able to bring in homes that can

work more closely with families? Are we able to bring in homes that can commit to a family over time as opposed to taking a child for three to five days until we can find another home? So a lot of it is not just based on numbers but also the type of homes you look at."); *cf.* Trial Ex. 671, Findings Initial Child & Family Service Reviews: 2001–2004, at 22 (including "[m]ismatching placements to children's needs" among common concerns regarding placement stability).

## D. Permanency

Because substitute care is a less-than-optimal outcome for children, achieving permanency for children in foster care is among DCF's highest-priority objectives. *See* 110 Mass.Code Regs. 1.02(3)-(4). To this end, DCF is called upon to "direct [its] efforts toward reunification of child(ren) and parent(s)," and "[a]s soon as it is determined that reunification is not feasible, the Department [is instructed to] take swift action to implement another permanent plan, such as adoption or guardianship." 110 Mass.Code Regs. 1.02(4). Massachusetts regulations mandate that DCF provide to every family receiving foster care services a service plan that lays out the conditions necessary to achieve one of three goals, the two most relevant being (1) the reunification of a foster child with her family, or (2) the provision of an alter-native permanent home for a foster child. 110 Mass.Code Regs. 6.01(1)(b)-(c), 6.02.

One of the principal ways to gauge success in this area is to appraise the rate at which foster children who have exited the foster care system reenter it. *See* Trial Tr. vol. 19, 16:4–17:1, May 7, 2013, ECF No. 347. In the first-round CFSR, Massachusetts's rate of reentry was 22.3%, more than two-and-a-half times greater than the national standard of 8.6% during the 2000–2001 review period. First–Round CFSR Final Assessment CSF–000000306. By the second-round CFSR, only 15.7% of children leaving the Massachusetts foster care system reentered it, a figure still above the national median performance of 15% during the 2006–2007 review period. Second–Round CFSR Final Report CSF–000000765. In federal fiscal year 2010, 15.3% of Massachusetts foster children who were discharged on the basis of reunification reentered foster care within twelve months from the date of discharge, Children's Bureau, U.S. Dep't of Health & Human Servs., *Child Welfare Outcomes 2008–2011: Report to Congress* 178 (2012), *available at* http://www.acf.hhs.gov/sites/default/files/cb/cwo08—11.pdf [hereinafter *Child Welfare Outcomes 2008–2011* ],[22] which placed the Commonwealth forty-first among fifty-two reporting jurisdictions, Trial Ex. 1084, Table Summaries Child Welfare Outcomes Data 2010 ("Child Welfare Outcomes Tables 2010") 6.[23] The

22. Technically, the Children's Bureau report on child welfare outcomes publicizing statistics from federal fiscal years 2008 to 2011 is not in evidence. *See* Parties' Am. Uncontested Ex. List., Ex. A, Joint Uncontested Exs., ECF No. 367–1. The Court did, however, admit in evidence under Federal Rule of Evidence 1006 a series of tables prepared by Elissa Glucksman Hyne ("Hyne"), a senior policy analyst at Children's Rights, the national watchdog organization that spearheaded this action against the Defendants on behalf of the Plaintiffs. *See* Trial Tr. vol. 8, 52:6–11, 53:7–20, 57:19–20; Trial Ex. 1084, Table

Summaries Child Welfare Outcomes Data 2010; Trial Ex. 1085, Table Summaries Child Welfare Outcomes 2008–2011: Report Congress. Hyne's tables reproduce data found in the Children's Bureau report. *See* Trial Tr. vol. 8, 69:7–9. Consequently, the Court cites to the online-accessible version of the report.

23. In addition to summarizing federal child welfare outcome data, Hynes's tables assigned rankings to each state, the District of Columbia, and Puerto Rico on the basis of their performance on various child welfare outcome measures. *See* Trial Tr. vol. 8, 56:4–15.

next year, the rate of reentry crept up to 15.6%, *Child Welfare Outcomes 2008–2011*, at 178, and Massachusetts's national rank fell to forty-third, Trial Ex. 1085, Table Summaries Child Welfare Outcomes 2008–2011: Report Congress ("Child Welfare Outcomes Tables 2008–2011") 7. Although the reported rates of reentry from federal fiscal years 2010 and 2011 marked improvements over those seen in the prior decade, they nevertheless deviated fairly significantly from the national medians at that time. *See Child Welfare Outcomes 2008–2011*, at viii tbl. 2 (showing median rates of 12.6% and 11.8% for 2010 and 2011, respectively).

Where reunification is impossible or impracticable, the timeliness of adoptions serves instead as a bellwether of progress in permanency. *See* Trial Tr. vol. 19, 17:13–18:6. According to results from the first-round CFSR for federal fiscal year 1999, the median length of time for foster children in Massachusetts to achieve adoption was 49.28 months. First-Round CFSR Statewide Assessment CSF-000000428–30. During federal fiscal year 2010, Massachusetts achieved a composite score [24] of 83.7 in timeliness of adoptions, *Child Welfare Outcomes 2008–2011*, at 178, which represents forty-seventh place among fifty-two reporting jurisdictions,

Child Welfare Outcomes Tables 2010, at 7. For fiscal year 2011, Massachusetts obtained a composite score of 76.2, Child Welfare Outcomes 2008–2011, at 178, which caused it to drop two places to forty-ninth place, Child Welfare Outcomes Tables 2008–2011, at 8. On a micro level, Dr. Azzi–Lessing's case file review squared with the national results. She found that DCF had failed to achieve permanent placements for all five Named Plaintiffs. *See* Trial Tr. vol. 7, 73:3–77:15. What's more, DCF's efforts in this regard were plagued by inconsistency and "inertia," Trial Tr. vol. 7, 75:21, causing the Named Plaintiffs to "languish" in foster care for years, *id.* at 73:8, without clear prospects for permanency.

### E. Case Worker Visitation

Federal law requires that caseworkers visit the children in foster care to whom they are assigned on a monthly basis. 42 U.S.C. § 624(f)(1)(A). Research shows that a correlation exists between the frequency of caseworker visits and favorable foster care outcomes. Trial Tr. vol. 17, 107:20–21, May 3, 2013, ECF No. 342.

From 2008 to 2011, between 43% and 50% of children received monthly visits from the caseworkers, *Child Welfare Outcomes 2008–2011*, at 173, which fell far

The Court declined to admit the rankings, given that they were the product of "simple arithmetic." *Id.* at 57:22; *see id.* at 57:19–23. The Court has since independently verified Hyne's calculations and thus gives credence to her ranked orderings as a reflection of the Court's own arithmetic computation.

**24.** The composite score reflects an aggregate appraisal of five individual measures related to the timeliness of adoptions: (1) the percentage of children discharged from foster care to a finalized adoption less than twenty-four months from the date of the last removal from home; (2) the median length of stay in care, from the date of the last removal to the date of adoption, of all children in foster care

who were discharged to a finalized adoption; (3) the percentage of children in foster care who were in care for seventeen or more continuous months as of the first day of the year and who were discharged to a finalized adoption by the final day of the year; (4) the percentage of children who were in care for seventeen or more continuous months and not legally free for adoption as of the first day of the year, who then became legally free for adoption during the first half of the year; and (5) the percentage of children discharged to a finalized adoption less than twelve months after becoming legally free for adoption. *Child Welfare Outcomes 2008–2011,* at 178 & n. 16.

below the 90% benchmark set for this metric during that time period, Trial Ex. 153, Monthly Caseworker Visits Data Fiscal Year (FY) 2007, at 3. CRC's review indicated that only 12.9% of children in the two-year cohort received consistent monthly contact from their caseworker throughout the two-year review period. CRC Study tbl. 41. The study also found that 16.1% of children in the entry cohort received no contact at all from their caseworker during their first month in DCF's care. CRC Study tbl. 12.

### F. Services

#### 1. Preparing Foster Children for Adulthood

The provision of life skills to foster children is a core responsibility of child welfare agencies. *See, e.g.,* Trial Ex. 2, Case Practice Policy & Procedures Manual DCF POL 201 ("It is critical that youth served by [DCF] be systematically and comprehensively prepared for independent living to enable them to function as productive members of society."). To this end, 42 U.S.C. section 675(5)(H) provides, in relevant part:

> [D]uring the 90–day period immediately prior to the date on which [a foster] child will attain 18 years of age, ... a caseworker on the staff of the State agency, and, as appropriate, other representatives of the child [must] provide the child with assistance and support in developing a transition plan that is personalized at the direction of the child, [which] includes specific options on housing, health insurance, education, local opportunities for mentors and continuing support services, and work force supports and employment services, ... information about the importance of designating another individual to make health care treatment decisions on behalf of the child if the child becomes

unable to participate in such decisions and the child does not have, or does not want, a relative who would otherwise be authorized under State law to make such decisions, and provides the child with the option to execute a health care power of attorney, health care proxy, or other similar document recognized under State law, and is as detailed as the child may elect. . . .

42 U.S.C. § 675(5)(H).

Many children, however, "age out" of foster care without ever having learned the necessary life skills to succeed outside the walls of a foster placement. In both the first- and second-round CFSRs, the provision of independent living services was deemed an area needing improvement. *See* First–Round CFSR Final Assessment CSF–000000327; Second–Round CFSR Final Report CSF–000000777. Indeed, in the third quarter of state fiscal year 2012, nearly as many children left their placements at the age of eighteen as were adopted. DCF Quarterly Reports, 2008–2012, Tab Q3 2012, at 60 tbl. 21.

#### 2. Medical Services

Every child, upon entry into the Massachusetts foster care system, must be "screened and evaluated under the early and periodic screening, diagnostic and treatment [ ("EPSDT") ] standards established by Title XIX of the Social Security Act." Mass. Gen. Laws ch. 119, § 32. EPSDT services are manifold: among others, they include regular pediatric preventive healthcare visits, physical and nutritional assessments, and developmental and behavioral screening. *See* Trial Ex. 621, Early & Periodic Screening, Diagnosis, & Treatment (EPSDT) Med. Protocol & Periodicity Schedule (Med. Schedule) & EPSDT Dental Protocol & Periodicity Schedule (Dental Schedule) DCF006427603–10. "Medical passports" are documents prescribed by Massachu-

setts regulations for use in the foster care system to keep track of a child's medical, dental, mental health, and developmental history for the length of the child's stay in foster care. 110 Mass.Code Regs. 7.124. DCF personnel are required to maintain medical passports for each child in its care, *id.*, and are expected regularly to update the passports with relevant information regarding each child's responses to medication and treatment interventions, *see* Trial Tr. vol. 2, 60:13–61:3, 63:7–15.

Evidence in the record suggests that foster children in Massachusetts commonly receive medical screenings in an untimely fashion, if at all. In 2011, just 12.1% of foster children received on-time, seven-day medical visits; 7.1% received on-time, thirty-day medical visits; and 18.2% completed a medical visit. Trial Ex. 610, Monthly Compliance Medical Screenings Due 2011, at 1.

It is also rare to have medical information that is fully complete. The CRC researchers found that only 52.1% and 73.7% of children in the entry cohort and children in the two-year cohort were provided medical passports at their scheduled time. CRC Study Appendix C tbl. C37. Dr. Bellonci opined that he rarely sees medical passports when meeting with patients, which reflects something akin to the rule rather than the exception. Trial Tr. vol. 2, 62:1–17 ("In my 20 years of working with this population, I saw medical passport approximately three or four times. And that's not an unusual experience." *Id.* at 62:5–7).

### 3. Psychotropic Medication

Children in foster care often enter the system with a history of biological and psychological problems, due in no small part to abuse, neglect and frequent environmental changes. *See* Trial Ex. 17, AACAP Position Statement Oversight Psychotropic Medication Use Children State Custody: Best Principles Guideline ("AACAP Guidelines") 1. As a result, foster children are often prescribed psychotropic drugs to treat persistent behavioral and emotional issues. *See id.*

National data suggests that foster children in Massachusetts are prescribed psychotropic drugs at rates exceeding those in other states. A report published by the U.S. Government Accountability Office (the "GAO") in 2011, reviewing psychotropic drug prescription rates and oversight practices in five states (including Massachusetts) in 2008, found that Massachusetts had the highest percentage of children prescribed psychotropic medication among the states considered in the report.[25] *Compare* Trial Ex. 16, Foster Children: HHS Guidance Could Help States Improve Oversight Psychotropic Prescriptions ("GAO Report") 102 app. XVII (noting that 39.1% of foster children in Massachusetts are prescribed psychotropic drugs), *with id.* at 101 app. XVII (noting that 22.0% of foster children in Florida are prescribed psychotropic drugs), *id.* at 103 app. XVII (noting that 21.0% of foster children in Michigan are prescribed psychotropic drugs), *id.* at 104 app. XVII (noting that 19.7% of foster children in Oregon are prescribed psychotropic drugs), *and id.* at 105 app. XVII (noting that 32.2% of foster children in Texas are prescribed psychotropic drugs). More particularly, 4.9% of children between the ages of zero and five, 44.8% of children between the ages of six and twelve, and 53.4% of children between the

---

25. Results derived from the CRC's more targeted population study support those announced by the GAO. *See* CRC Study Appendix C tbl. C46 (finding that in the CRC study, 16.5% of the children in the entry cohort and 52.1% of the children in the two-year cohort were given psychotropic medication).

ages of thirteen and seventeen had been prescribed psychotropic drugs, which exceeded the prescription percentages for nonfoster children in each demographic band by between two and four times. *Id.* at 102 app. XVII. Overall, foster children in Massachusetts were also 3.8 times more likely to be prescribed psychotropic drugs than children outside of foster care in the Commonwealth, *see id.*, which sat squarely in the middle range among the five states,[26] *See id.* at 101 app. XVII, 103–05 app. XVII.

There are numerous side effects associated with taking psychotropic medications, including hallucinations, mania, paranoia, headaches, nausea, sexual and menstrual problems, rashes, suicidal thoughts, and pancreatic and liver damage, *See id.* at 41–44 app. II, and additional indicia point to the potential for other health risks. Research suggests that the concomitant use of five or more psychotropic drugs by children holds no medical benefits, that higher doses of psychotropic drugs may prove less effective than the recommended dose, and that no medical evidence supports the use of psychotropic drugs in children under the age of one. *See id.* at 14–15. The GAO report found that 1.33% of foster children in Massachusetts are prescribed five or more psychotropic medications concomitantly, *id.* at 107 app. XVIII, which exceeds the percentage of children prescribed five or more medications in all four of the other surveyed states, *See id.* at 106 app. XVIII, 108–10 app. XVIII. Moreover,

2.21% of foster children in Massachusetts were given dosages of psychotropic medications exceeding the maximum amounts cited on FDA-approved drug labels, *id.* at 107 app. XVIII, a percentage that dwarfed those found in three of the four other states, *See id.* at 106 app. XVIII, 108–10 app. XVIII.

The administration of psychotropic drugs is only one piece of the puzzle, however: informed consent, clinical oversight, and monitoring systems are required to have a fully functioning medical apparatus in the foster care system. Psychotropic drugs cannot be prescribed without the informed consent of either a child's parent or guardian or the state, standing *in loco parentis*, *see* Trial Tr. vol. 2, 9:20–10:3; AACAP Guidelines 2, and according to AACAP guidelines, the assent[27] of the child herself also ought be obtained, AACAP Guidelines 2. Clinical oversight and documentation—manifested in the form of medical passports—are particularly helpful, given the frequent movement of foster children from one placement to the next. *Cf.* Trial Tr. vol. 2, 64:24–65:12 (explaining that medical treatment of children who experience multiple placement moves is challenging because of the multiplicity of sources a medical provider must canvas to collect a patient's complete medical history). Further, federal law calls for the deployment of comprehensive monitoring systems, 42 U.S.C. § 622(b)(15)(A) (mandating that child welfare services plans

---

**26.** The Court acknowledges, however, the danger in drawing conclusive inferences from comparisons between children in and outside of foster care, as the children who enter foster care may, given their often severe physical and emotional issues and troubling life experiences, need medical intervention more than the average child.

**27.** "Consent" refers to the approval of medical treatment given by an individual who is

legally empowered to give such approval; "assent," on the other hand, refers to the approval of medical treatment given by one who is legally unable to give her consent, like a child. *See* Jessica Setless, Note, *The Crisis of Over–Medicating Children in Foster Care: Legal Reform Recommendations for New York*, 19 Cardozo J.L. & Gender 609, 623 n. 140 (2013).

contain, *inter alia,* "a plan for the ongoing oversight and coordination of health care services for any child in a foster care placement"), which aim to moderate the risks associated with psychotropic medications, *see* AACAP Guidelines 2 (noting that child welfare agencies should, at a minimum, "[e]stablish guidelines for the use of psychotropic medications for youth in state custody"[28]).

Proof of unauthorized or excessive psychotropic prescriptions were rampant in the three Named Plaintiffs' case files reviewed by Dr. Bellonci. *See* Trial Tr. vol. 2, 80:5–82:19. Similarly, medical files reviewed in the CRC study rarely included critical information such as when a child had first been prescribed a medication or even whether a child was being treated with medication at all. *See* Trial Tr. vol. 4, 50:1–9.

Massachusetts has a mechanism for overseeing the administration of certain psychotropic drugs, however. Pursuant to the *Rogers* process,[29] courts are formally required to authorize the prescription of antipsychotic medications—a subclass of drugs within the family of psychotropic medications, Trial Tr. vol. 1, 126:20–25—to children in DCF custody. Trial Tr. vol. 10, 116:1–5, Feb. 15, 2013, ECF No. 334. In 2009, a working group comprised of representatives from Massachusetts health and welfare agencies and university researchers, the Massachusetts Department of Mental Health, the OCA, and DCF was convened to address issues related to the process of obtaining consent for the prescription of psychotropic medications to children. *See* Trial Tr. vol. 2, 31:16–17; Trial Tr. vol. 10, 116:6–9, 116:13–20; Trial Ex. 630, Rogers Process Working Grp. Minutes DCF004956552. A study commissioned by the OCA in service of the *Rogers* working group identified a host of benefits of the *Rogers* process—namely, secondary review of antipsychotic prescriptions prior to treatment, the appointment of guardians *ad litem,* and dedicated resource allocation. Trial Ex. 1090, Examination *Rogers* Process Youth Custody Mass. Dep't Children & Families ("Rogers Report") 8. A number of challenges were also brought to the fore: the *Rogers* process was without adequate standardization, coordination, and quality assurances; was slow-going; failed to take proper account of medical expertise; and featured inadequate systemic oversight of antipsychotic medication administration. *Id.* at 9–10. Perhaps most troubling, drugs that are not listed as *Rogers*-process eligible—namely, nonantipsychotic psychotropic medications, of which there are numerous kinds—are prescribed without the consent of a court or of DCF. Pls.' Designations Fact Dep. Jan Nisenbaum 194:1–8, May 18, 2012, ECF No. 226–1. The study offered a number of recommendations that might resolve these issues, *see* Rogers Report 13–16, but it is unclear whether any of the recommendations that emerged out of the *Rogers* work-

---

**28.** AACAP lists the establishment of child welfare training requirements, the creation of programs for the oversight of medication utilization, the maintenance of certain medical records information, and the design of a psychiatric consultation program as recommended or ideal action. *See* AACAP Guidelines 2–3.

**29.** The *Rogers* process takes its name from *Rogers v. Commissioner of Dep't of Mental Health,* 390 Mass. 489, 458 N.E.2d 308 (1983), in which the Massachusetts Supreme Judicial Court held that an incompetent patient may be compelled to undergo nonemergency, antipsychotic drug therapy only after a judicial determination is made to that effect. *See id.* at 500–02, 458 N.E.2d 308. The court's reasoning was later adopted in regulations by DCF's predecessor agency. Trial Ex. 1090, Examination *Rogers* Process Youth Custody Mass. Dep't Children & Families 2.

ing group were ever implemented, *see* Trial Tr. vol. 2, 35:23–36:1.

## G. Caseloads

Massachusetts General Laws chapter 18B, section 7 empowers the Commissioner of DCF with the authority to "establish reasonable caseload rates." Mass. Gen. Laws ch. 18B, § 7(a). The term "caseload" refers to the number of children for which an individual caseworker is responsible at a given time. Trial Tr. vol. 11, 31:25–32:1. Because the mere number of children per caseworker fails fully to capture the actual burden that caseworkers must shoulder, however, "workload" is the more favored metric to use to analyze the reasonability of caseloads. *See id.* at 32:9–12. A caseworker's workload comprises a "multitude of tasks related to the actual caseload of one child," *id.* at 32:22–23, including traveling to and from the child's home to facilitate sibling visits, scheduling appointments, composing permanency requirements, and performing data entry, *See id.* at 32:12–21. For a workload to be deemed manageable, national standards dictate that caseworkers "simply have to have enough time to meet their practice requirements based on how their state is organized, or how their agency is organized," *id.* at 35:12–18, taking into consideration caseworkers' qualifications and subject-matter competencies, *id.* at 35:18–20. Generally speaking, a workload study must be undertaken to gauge the appropriateness of caseworker caseloads. *Id.* at 36:20–22. Nevertheless, national standards suggest that, even in the absence of a workload study, caseloads of between twelve and eighteen children represent the maximum that a caseworker can carry while still satisfying her job requirements.

*See id.* at 36:22–25 (noting that CWLA recommends caseload ratios of between twelve and fifteen children per caseworker); *id.* at 37:16–18 (noting that COA recommends caseload ratios of between twelve and eighteen children per caseworker).

DCF employs individuals known in internal agency parlance as "ongoing" caseworkers who provide continuous services to children in the foster care system. *See id.* at 38:8–17. Unlike their equivalents in most other states' child welfare agencies, DCF's ongoing caseworkers carry "mixed" caseloads, meaning that they are responsible for providing services to children placed both in their family home or in a foster home. *See id.* at 40:23–41:3; Trial Ex. 642, Dep't Children & Families Proposal Reducing Ongoing Caseloads ("15 Families Initiative Presentation") DCF010275221. DCF has not conducted or commissioned its own workload study, nor has it adapted those performed by other child welfare agencies. *See* Trial Tr. vol. 11, 45:19–24; Trial Tr. vol. 16, 92:11–15. Instead, DCF's current caseload standards—which derive from a collective bargaining agreement originally struck in the mid–1980s between the Commonwealth and the union representing the interests of DCF caseworkers, *see* Trial Ex. 641, Dep't Children & Families Rationale for Reducing Ongoing Caseloads DCF010278533—prescribe that ongoing caseworkers be assigned eighteen cases per month.[30] Trial Ex. 21, Collective Bargaining Agreement 121. In 2005, the two contracting parties agreed in a memorandum of understanding to assign weights to caseloads to account more accurately for caseworkers' actual workload. Trial Ex. 647, Mem. Understanding Between Dep't

---

**30.** This 18:1 caseload ratio applies regardless of whether a child is in an in-home or out-of- home placement. *See* Tr. vol. 11, 43:14–18.

Soc. Servs. & DSS Chapter SEIU Local 509 Concerning Family Res. Workers DCF003540781 (weighting, for example, 0.6 points per active foster home, 0.9 points per foster home undergoing licensure, 0.75 points per licensed foster home on probation, and 0.4 points per out-of-state foster home).

Since at least 2008, scores of DCF caseworkers have carried caseloads in excess of the agreed-upon eighteen cases. See, e.g., Trial Ex. 957, Workers Weighted Caseloads Greater 18 Reports, 2008–2012 ("Caseloads Reports"), Tab June 2008, at 57 (reporting that as of June 30, 2008, 1034 social workers across six regional offices and a special investigations unit had weighted workloads of over eighteen cases); id. Tab June 2009, at 48 (reporting that as of June 30, 2009, 836 social workers across six regional offices and a special investigations unit had weighted workloads of over eighteen cases); id. Tab June 2010, at 24 (reporting that, as of June 30, 2010, 777 social workers across six regional offices had weighted workloads of over eighteen cases); id. Tab June 2011, at 15 (reporting that, as of June 30, 2011, 492 social workers across four regional offices had weighted workloads of over eighteen cases).[31] Indeed, as of August 2012 (the last month from which the parties could gather facts in this case), 390 caseworkers had weighted workloads of greater than eighteen cases. Id. Tab August 2012, at 11.

Observing that the 18:1 caseload ratio established in the 1980s collective bargaining agreement was "[r]apidly [b]ecoming [o]bsolete," 15 Families Initiative Presentation DCF010275219, DCF launched a campaign known as the "15 Families Initiative," with the aim of reducing caseload ratios to 15:1, see Pls.' Designations Fact Dep. Angelo McClain DCF's Chief Staff ("McClain Dep.") 132:1–23, May 25, 2012, ECF No. 226–1. DCF acknowledged that such a reduction would bring the Commonwealth in line with national trends and standards. 15 Families Initiative Presentation DCF010275220–21. In order to achieve this goal, however, DCF estimated that it would need nearly two hundred additional ongoing caseworkers at an approximate annual cost of about $10,100,000. Id. at DCF010275224.

## H. Qualifications and Training

Optimally, child welfare agencies should implement social worker training development programs that feature, among other elements, new-hire curricula, on-the-job and supervised training, performance evaluations, continuing in-service training, channels for feedback, and plans for routine reviews and updates of training practices. See Trial Tr. vol. 11, 93:6–21. See generally Trial Ex. 1092, Building Effective Training Sys. Child Welfare Agencies.

DCF regularly hires ongoing caseworkers through a competitive, Department-sponsored internship program. Pls.' Designations Rule 30(b)(6) Dep. Olga I. Roche Re: Staffing, Caseloads, & Training 146:1–147:1, Jan. 20, 2012, ECF No. 226–1. Candidates are often recent college graduates holding a bachelor's degree or an associate's degree paired with relevant work experience. Id. In either case, caseworkers typically arrive at DCF full-time with a fair degree of prior experience. See id.

New recruits must participate in a competency training program, held monthly, where incoming caseworkers are trained in areas ranging from child development and

**31.** The statistics cited here, which come from DCF's own caseload reports, include data for assessment unit, adolescent unit, and intake/investigations unit caseworkers, as well as ongoing caseworkers. See Caseloads Reports.

diversity to deescalation and safety techniques. Trial Ex. 374, Annual Progress & Servs. Report: Fed. FY2012 ("DCF FY2012 Progress Report") DCF007413805. Funding cuts, however, have led to a reduction in the number of training programs, *See id.* at DCF007413695 (recounting a cut of $200,000 from the budget for the Child Welfare Training Institute since fiscal year 2011), and due to heavy workloads, existing training opportunities frequently go underutilized, *see* First–Round CFSR Final Assessment CSF–000000356.

## I. Accountability Systems

To maintain eligibility for funding under Title IV–B of the Social Security Act, states must prepare and submit a five-year Child and Family Services Plan ("CFSP"). *State & Tribal Child & Family Services Plan,* Children's Bureau, http://www.acf.hhs.gov/programs/cb/programs/state-tribal-cfsp (last visited November 20, 2013). The CFSP is a document that describes foster care services offered by the state. 45 C.F.R. § 1357.10(c). Among a host of other requirements, the CFSP must include "a description of the quality assurance system [the state] will use to regularly assess the quality of services under the CFSP and assure that there will be measures to address identified problems." 45 C.F.R. § 1357.15(u). There is at present a dearth of staff members whose roles are dedicated to managing continuous quality improvement. *See* Pls.' Designations Fact Dep. Ruben Ferreira 13:16–15:14, Feb. 2, 2012, ECF No. 226–1.

DCF's internal review system is driven in part by a periodic publication known as the Continuous Quality Improvement management report, commonly referred to as a scorecard. *See* Trial Ex. 964, CFSR Measures Reports 2008–2012 ("CFSR Scorecards"); Trial Tr. vol. 14, 59:24–25, Apr. 30, 2013, ECF No. 339. Each quarter, the CFSR scorecard documents the agency's twelve-month performance on seventeen measures tracked nationally by ACF, such as "Absence of Maltreatment Recurrence," "Median Time to Reunification," and "Percent [of Children Exiting to Adoption] Who Exit In Less Than 24 Months." *See* Trial Tr. vol. 14, 59:24–25, 60:2–8, 60:22–23. For each measure, the scorecard compares the state's overall performance and the performance of individual regions and cities to a target benchmark based on nationwide performance. *See* CFSR Scorecards. The results are distributed to DCF management staff throughout the state. *See* Trial Tr. vol. 14, 60:8–11.

To bolster internal agency morale and to help managers quickly identify areas in the most need of improvement, the presentation of information on the scorecards has changed over the years. *Id.* at 74:7–19; 76:23–25, 76:1–12. The first scorecards issued in 2008 labeled data with green and red arrows to identify whether DCF performed at a level above or below the national standard. *See, e.g.,* CFSR Scorecards, Tab December 31, 2008. In 2011, the scorecard design began to use letter grades and a new grading method, based on how close DCF's performance came to meeting the target benchmark and the national median. *See* CFSR Scorecards, Tab June 30, 2011. For example, the scorecard issued on December 31, 2011 shows that in the preceding twelve months, there was "Absence of Maltreatment Recurrence" in 92.3% of DCF cases statewide. *See* CFSR Scorecards, Tab December 31, 2011, at DCF011158648. The target performance level for this measure is 94.6%,[32] and the national medi-

---

**32.** Target performance levels for all measures

did not change from 2008 through September

an is 93.3%. *Id.* Whereas previous scorecards would have used a red arrow to highlight that DCF fell short of the benchmark that year, under the new grading method the state was assigned A+ letter grades for its performance relative to the target benchmark and the national median.[33] This means that an A+ letter grade can correspond to performance at a level just below the national median. *See* Trial Tr. vol. 14, 78:19–23. Under this grading method, the same scorecard assigned to DCF an A—and an A+ grade in another area where the agency underperformed the twenty-fifth percentile of the national standard. *See* CFSR Scorecards, Tab December 31, 2011, at DCF011158648 (awarding, on the measure "C1.2: Median Time to Reunification," an A- for the state's performance relative to the twenty-fifth percentile and an A+ for the state's performance relative to the median).

### J. Foster Care Maintenance Payments

The AACWA designates certain federal funds to be allocated to states to assist with their administration of foster care services. To remain eligible to receive federal funds under the AACWA, states must, *inter alia,* issue per diem allowances—known more commonly as "foster care maintenance payments"—to foster parents for the costs associated with raising children removed from their familial homes.[34] *See* 42 U.S.C. § 672(a)(1). The daily rates at which these foster care maintenance payments ought be disbursed are set by the U.S. Department of Agriculture ("USDA"). *See* Mass. Gen. Laws ch. 119, § 23(h). Massachusetts law requires DCF to make foster care maintenance payments at the USDA-recommended levels and periodically to adjust the amount of these payments in accordance with "the financial circumstances of the family, the needs of the child or the rate of inflation." *Id.*

From 2004 until March 2012, DCF's foster care maintenance rates stagnated, lingering at $17.10 per day for children between the ages of zero and five, $17.96 per day for children between the ages of six and twelve, and $18.59 per day for children ages thirteen and over. Trial Ex. 187, Historical FC Rates (listing historical foster care maintenance and other allotment rates from before fiscal year 1997 to the present). Although the Court does not have before it the USDA rates for the entirety of that time period, the USDA rates established in 2008 (and apparently in effect until at least 2010) were set at $20.60, $23.14, and $24.52 per day for each of the three respective demographic groups in the Urban Northeast region. Trial Ex. 11, Sept. 28, 2010 Letter Angelo McClain Re: FY12 Maintenance Request ("Sept. 28 McClain Letter") DCF000827080. DCF's rates over four years, therefore, consistently fell between 17% and 24% below the 2008 USDA rates. *Id.*

---

2012, the date of the last scorecard submitted in evidence. *See* CFSR Scorecards.

**33.** This grade is determined by calculating the ratio between DCF's performance and the national standard. In other words, DCF achieved 97.5% of the national standard because the state-to-national ratio of 92.3 to 94.6 is 97.5%, a percentage corresponding to an A+ grade.

**34.** These include costs associated with "food, clothing, shelter, daily supervision, school supplies, a child's personal incidentals, liability insurance with respect to a child, reasonable travel to the child's home for visitation, and reasonable travel for the child to remain in the school in which the child is enrolled at the time of placement." 42 U.S.C. § 675(4)(A).

In fiscal years 2010 and 2011, DCF issued foster care recompense payments of $5 per day, per child for expenses incurred over the course of two six-month periods during those years in an effort to reimburse foster parents retroactively for the outlays they had made while receiving below-USDA-level foster care maintenance payments. Pls.' Designations 30(b)(6) Dep. Ellen Finnegan Re: Foster Care Maintenance Payment Rates 163:14–164:1, Oct. 5, 2011, ECF No. 226–1. These catch-up payments, however, were regarded only as temporary expenditures; the official foster care maintenance rate schedule did not see any upward adjustment. *See* Trial Tr. vol. 12, 20:21–21:1; *see also* Trial Ex. 13, Feb. 23, 2010 Letter Angelo McClain Re: Foster Care Recompense Payment DCF003570659. Moreover, in certain instances, the payments proved fruitless by the time they were disbursed, as the children the payments were intended to benefit no longer resided with the foster parents receiving the recompense. *See* Trial Tr. vol. 12, 20:14–18.

On March 1, 2012, thanks to a $12,000,000 set-aside in the state budget, DCF finally brought its foster care maintenance rates up to USDA levels. McClain Dep. 150:18–151:9. At trial, however, McClain recounted the rather unexpected nature of the rate increase, Trial Tr. vol. 15, 110:20–22, May 1, 2013, ECF No. 340 ("The stars aligned and we were able, we got $12 million in the budget last year and we were able to raise the rates."), and expressed a degree of uncertainty as to how the Department would be able to obtain the funds necessary to raise rates in the upcoming fiscal year, *id.* at 110:23–111:5 ("We calculated [the foster care maintenance payment rate] for this year

starting July 1st, and we would need another $2 million to raise the rates again. . . . [A plan to seek that money from the state legislature] was in the governor's budget, and we're hoping it will make its way through the legislative process."). Crabtree also testified to the fact that although DCF managed to raise its rates, "[the raise] was not legislatively part of the code[,] [so] with a new commissioner . . . that could change." Trial Tr. vol. 12, 23:15–17; *see also id.* at 23:10–21.

### K. Case Plans

States accepting federal funds for the administration of child welfare systems are also required under the AACWA to "develop[ ] . . . a case plan . . . for each child receiving foster care maintenance payments." 42 U.S.C. § 671(a)(16). A case plan must include a broad swath of information pertaining to a foster child, such as the appropriateness of the child's prospective placement, details on the services that the child is expected to receive, the child's health and education records, and plans certifying the steps taken towards ensuring permanency and educational stability. 42 U.S.C. § 675(1)(A)-(G).

In the CRC study, 14.6% of children in the entry cohort and 35.1% of children in the two-year cohort were missing case plans in their case files.[35] CRC Study tbls. 28a & 55a. Of the entry cohort case files containing case plans for children who had been in DCF for thirty-one or more days, many of them were incomplete: only 65.8% of the case plans contained child service data, and 73.9% of the case plans contained family service data. *Id.* tbl. 29. The case plans for children in the two-year cohort featured even greater lacunae. *See id.* tbl. 56 (reporting that only 31.8% of

---

**35.** The CRC researchers referred to "service plans" in their study. That term is synonymous with "case plans," however.

two-year cohort case plans contained child service data and that a mere 10.7% of two-year cohort case plans contained any family service data).

## L. Notice and Process

DCF must conduct a review of foster care services and goals within six months of a child's removal from her family home and, thereafter, every six months. *See* 110 Mass.Code Regs. 6.10(1). A hearing setting out permanency goals must be held within a year of a child's removal from her home. Mass. Gen. Laws ch. 119, § 29B(a). Massachusetts regulations provide that DCF "shall give written notice to a client [36] if the Department intends to deny, reduce, or terminate [foster care] services, or increase the cost thereof." [37] 110 Mass.Code Regs. 8.01(1). The notice must include, *inter alia*, "a statement of what action the Department intends to take," "the reasons for the action," and "the date on which the action shall become effective," 110 Mass. Code Regs. 8.01(1)(a)-(c), and must be memorialized in writing and delivered to the foster child or family no less than fourteen days before the date of the intended action. 110 Mass.Code Regs. 8.01(2). The suspension of services may be appealed through an administrative review known as a "Fair Hearing," 110 Mass.Code Regs. 10.10, which must be held within sixty-five business days of the appeal's initiation, 110 Mass.Code Regs. 10.10(1). It is unclear whether notice of suspended services is provided in every instance. *See, e.g.,* Pls.'

Designations Fact Dep. Virginia Peel ("Peel Dep.") 84:24–85:22, Feb. 8, 2012, ECF No. 226–1. Budget cuts have led to significant backlogs in fair hearings. McClain Dep. 147:17–148:1.

In the CRC study, 11.6% of children in the entry cohort had received a foster care review within six months of entering DCF custody, and 57.5% of such children had attended a permanency hearing. CRC Study tbl. 20a. In the two-year cohort, 26.9% of children had had a foster care review within six months of entry, while 61.6% of said children had attended a permanency hearing. CRC Study tbl. 47a. Comparative statistics regarding other states' performance in providing notice and process to children in foster care are not available for cross-reference, however.

## III. RULINGS OF LAW

### A. Standard of Review

Federal Rule of Civil Procedure 52(c) ("Rule 52(c)") provides the standard that governs motions for judgment on the record [38] proffered to a court during the course of a jury-waived trial. *See Federal Ins. Co. v. HPSC, Inc.,* 480 F.3d 26, 32 (1st Cir.2007). A court must grant a motion for judgment on the record "where the plaintiff fails to make out a prima facie case, or despite a prima facie case, the court determines that the preponderance of evidence goes against the plaintiff's claim." *In re Stewart,* No. MB 12–017, 2012 WL 5189048, at *7 (B.A.P. 1st Cir.

---

**36.** Massachusetts regulations define a client as "[a]n applicant for or recipient of Department services," 110 Mass.Code. Regs. 10.02. For the purposes of Fair Hearings and other grievances, "[f]oster parents, pre-adoptive parents or adoptive parents in their status as such [are] considered clients." *Id.*

**37.** In certain instances—none of which apply here—advance notice need not be given. *See* 110 Mass.Code Regs. 8.01(3).

**38.** A motion for judgment on the record is synonymous with one for judgment as a matter of law made during the course of a bench trial, which receives treatment equivalent to a motion for judgment on partial findings under Rule 52(c). *See Federal Ins. Co. v. HPSC, Inc.,* 480 F.3d 26, 32 (1st Cir.2007).

Oct. 18 2012) (quoting *In re Giza*, 458 B.R. 16, 24 (Bankr.D.Mass.2011)) (internal quotation marks omitted); *see also Morales Feliciano v. Rullán*, 378 F.3d 42, 59 (1st Cir.2004) ("When a party has finished presenting evidence and that evidence is deemed by the trier insufficient to sustain the party's position, the court need not waste time, but, rather, may call a halt to the proceedings and enter judgment accordingly."). Unlike a motion for summary judgment, a court reviewing a motion for judgment on the record is not obligated to indulge all inferences in favor of the nonmoving party. *See Stewart*, 2012 WL 5189048, at *7.

## B. Institutional Reform Litigation

As a general matter, institutional reform litigation is a creature poorly suited for the courts, as the role of the workaday trial judge in such litigation is often rather precarious at best and downright ineffectual at worst.[39] Not insignificantly, an award of the injunctive and declaratory relief sought by the Plaintiffs here would encroach upon terrain that is rightfully the province of the legislature, *see Horne v. Flores*, 557 U.S. 433, 448, 129 S.Ct. 2579, 174 L.Ed.2d 406 (2009) ("[I]nstitutional reform injunctions often raise sensitive federalism concerns. Such litigation commonly involves areas of core state responsibility ...."),[40] and would commit this Court to the near-perpetual oversight of an already-complex child-welfare regime, *cf.* Abraham Chayes, *The Role of the Judge in Public Law Litigation*, 89 Harv. L.Rev. 1281, 1284 (1976) (noting that in institutional reform litigation "the trial judge has increasingly become the creator and manager of complex forms of ongoing relief, which have widespread effects on persons not before the court and require the judge's continuing involvement in administration and implementation"). What is more, the redistribution of scarce governmental resources would no doubt produce certain negative externalities, not the least of which include the deprivation of other state agencies of the means needed to perform their functions fully. *Horne,*

---

**39.** The late Judge Robert Keeton, a consummate jurist and erstwhile colleague, entertained a similar challenge to the Massachusetts foster care system more than three decades ago, which ultimately resulted in the ordering of a wide array of institutional reforms. *See Lynch v. King*, 550 F.Supp. 325 (D.Mass.1982) (Keeton, J.). Yet the fact that the Plaintiffs have revived many of the same claims in this instant action proves the limited utility that judicial orders have in effecting large-scale, structural change. Indeed, in the lead-in to his opinion, Judge Keeton presciently penned:

> [H]owever sufficient the plaintiffs' proof and the court's jurisdiction may appear, the stark reality is that judicial power to give effect to rights created by Congress is meager. No doubt a primary factor in the failure of protection of victimized children has been limited resources. And yet, ironically, the only relief the court can award is an order compelling state officials to give up some of those resources—funds appro-

priated by Congress—if federal requirements are not met. Thus, it may be that the only remedy the court can provide is a remedy that we shall later know to have been worse than none, and yet a remedy the court must grant when sought by persons legitimately entitled to demand it.

*Id.* at 327.

**40.** *See also* John Choon Yoo, *Who Measures the Chancellor's Foot? The Inherent Remedial Authority of the Federal Courts*, 84 Calif. L.Rev. 1121, 1123–24 (1996) ("[T]he Constitution does not permit the federal courts to exercise their remedial powers to engage in the structural reform of local institutions and local government. If the remedies needed to correct a constitutional violation lie outside a court's traditional remedial powers, then separation of powers principles require that the answer come from the political branches, which are far better equipped to manage the structural reform of state and local institutions."). The Court cites this article to note this restrictive point of view, not to endorse it.

557 U.S. at 448, 129 S.Ct. 2579 ("When a federal court orders that money be appropriated for one program, the effect is often to take funds away from other important programs.").

The Court's primary role, however, is to adjudicate the claims before it, such external considerations notwithstanding. *See Watson v. City of Memphis*, 373 U.S. 526, 537, 83 S.Ct. 1314, 10 L.Ed.2d 529 (1963) ("[I]t is obvious that vindication of conceded constitutional rights cannot be made dependent upon any theory that it is less expensive to deny than to afford them."). The Court thus turns to the deprivation of constitutional rights claimed here.

## C. Substantive Due Process

■ To prevail on a claim of deprivation of substantive due process under the Due Process Clause of the Fourteenth Amendment, "a plaintiff must … show a deprivation of life, liberty, or property." *Connor B.*, 771 F.Supp.2d at 159–60 (citing *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 196, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989)). The Supreme Court has on numerous occasions held that the Due Process Clause "generally confer[s] no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." *DeShaney*, 489 U.S. at 196, 109 S.Ct. 998; *see also Lyng v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am., UAW*, 485 U.S. 360, 369, 108 S.Ct. 1184, 99 L.Ed.2d 380 (1988); *Harris v. McRae*, 448 U.S. 297, 317–18, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980); *Lindsey v. Normet*, 405 U.S. 56, 74, 92 S.Ct. 862, 31 L.Ed.2d 36 (1972). "[I]n situations where a state creates a 'special relationship' because of the limitation which [the state] has imposed on [an individual's] freedom

to act on his own behalf," however, "its subsequent failure to protect an individual may amount to a substantive due process violation." *J.R. v. Gloria*, 593 F.3d 73, 79 (1st Cir.2010) (second and third alterations in original) (quoting *Rivera v. Rhode Island*, 402 F.3d 27, 34 (1st Cir.2005)) (internal quotation marks omitted). Numerous courts of appeals have held that a special relationship exists between state foster care agencies and the children held in their charge, *see, e.g., Norfleet ex rel. Norfleet v. Ark. Dep't of Human Servs.*, 989 F.2d 289, 291–93 (8th Cir.1993); *Yvonne L. ex rel. Lewis v. N.M. Dep't of Human Servs.*, 959 F.2d 883, 892–94 (10th Cir. 1992); *K.H. ex rel. Murphy v. Morgan*, 914 F.2d 846, 851–52 (7th Cir.1990); *Taylor ex rel. Walker v. Ledbetter*, 818 F.2d 791, 795 (11th Cir.1987), and the First Circuit has assumed as much *arguendo*, *J.R.*, 593 F.3d at 80.

■ The Supreme Court has confirmed, and the Defendants themselves acknowledge, that individuals consigned to the state's care have a constitutionally guaranteed right to "basic human needs [such as] food, clothing, shelter, medical care, and reasonable safety." *DeShaney*, 489 U.S. at 200, 109 S.Ct. 998; *see also* Defs.' Mem. 6. Nevertheless, the Defendants challenge the premise advanced by the Plaintiffs that foster children enjoy any of the additional rights claimed in the complaint, Defs.' Mem. 6 & n. 9—namely, those to (1) "a living environment that protects foster children's physical, mental and emotional safety and well-being"; (2) "services necessary to prevent foster children from deteriorating or being harmed physically, psychologically, or otherwise while in government custody"; (3) "treatment and care consistent with the purpose of the assumption of custody by DCF"; (4) "be maintained in custody [no] longer than is necessary"; (5) "receive care, treatment and

services determined and provided through the exercise of accepted professional judgment"; and (6) "be placed in the least restrictive placement according to a foster child's needs," Compl. ¶ 303(b)-(g).

■ This Court adheres to the reasoning first advanced in this case by Judge Ponsor at the motion-to-dismiss stage, that the Supreme Court's decision in *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), contemplates the first three putative rights as protected by the Constitution and that, by logical extension (particularly when viewed in light of the institutional failings discussed in Part II of this opinion), the last three items manifest the right to "reasonable care and safety," and thus are protections to which the Plaintiffs are equally entitled. *See Connor B.,* 771 F.Supp.2d at 161; *cf. Youngberg,* 457 U.S. at 324, 102 S.Ct. 2452 (noting that, in addition to providing basic necessities, "the State is under a duty to provide [the involuntarily committed] with . . . conditions of reasonable care and safety, reasonably nonrestrictive confinement conditions, and such training as may be required by these interests").

Merely establishing that foster children may demand from the state the expansive rights that inhere in personhood, however, is insufficient to demonstrate a violation of due process. The conduct of the state with respect to individuals in its care must additionally shock the conscience of the Court. *See Rivera,* 402 F.3d at 35; *see also Martínez v. Cui,* 608 F.3d 54, 64 (1st Cir.2010) ("[T]he shocks-the-conscience test . . . governs *all* substantive due process claims based on executive, as opposed to legislative, action.") (citations omitted).

There appears to be little consensus on the proper standard one ought apply in the deployment of the shocks-the-conscience test. Indeed, at least three different interpretations of the test have emerged out of the fray. The first standard, announced by the Supreme Court in *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), requires a showing of "deliberate indifference" on the part of state officials to the needs of those for whom they are responsible. *Id.* at 104–05, 97 S.Ct. 285. Six years later, in *Youngberg v. Romeo,* 457 U.S. at 307, 102 S.Ct. 2452, the Supreme Court held that decisions made by a professional regarding those who have been involuntarily committed to state custody are to be regarded "presumptively valid" and that "liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.* at 323, 102 S.Ct. 2452. Most recently, in *County of Sacramento v. Lewis,* 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998), the Supreme Court ruled that "in a due process challenge to executive action, the threshold question is whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Id.* at 847 n. 8, 118 S.Ct. 1708.

■ On the motions to dismiss, Judge Ponsor reviewed the merits of all three of the aforementioned tests but ultimately declined to adopt any of them, at least not in their independent forms.[41] *See Connor B.,* 771 F.Supp.2d at 162–63. Instead, he

---

**41.** Judge Ponsor noted that *"Youngberg* and *Lewis* are not mutually exclusive," *Connor B.,* 771 F.Supp.2d at 162, and regarded *Estelle* as inapposite because that case pertained only to incarcerated prisoners, whose more limited rights are justified given that the "conditions of [their] confinement are designed to punish," *id.* (quoting *Youngberg,* 457 U.S. at 321–22, 102 S.Ct. 2452) (internal quotation marks omitted).

devised a new, two-pronged approach that he deemed more suitable in the foster care context: "[T]o establish a substantive due process claim, Plaintiffs must show that Defendants' conduct represented a substantial departure from accepted professional judgment, which deprived them of conditions of reasonable care and safety, and that such conduct shocks the conscience." *Id.* at 163. Because no First Circuit authority explicitly prescribes the engagement of any particular standard,[42] and because inquiries into substantive due process are inherently context-dependent, *cf. Lewis,* 523 U.S. at 850, 118 S.Ct. 1708 ("Rules of due process are not, however, subject to mechanical application in unfamiliar territory.... [O]ur concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience shocking."), this Court treats Judge Ponsor's construction of the shocks-the-conscience test as law of the case and turns now to applying it.

■ After reviewing the extensive record set before this Court, it is apparent that the Defendants, in their administration of state-run foster care services, did not substantially depart from widely accepted professional judgment. True, the laundry list of problems plaguing DCF is well documented: whether the relevant metric is performance in minimizing maltreatment in care, facilitating appropriate placements and ensuring placement stability, achieving permanency in placement outcomes, providing educational and medical services, administering caseload management and training, or guaranteeing accountability, DCF has failed not only to comport with national standards of care and state and federal requirements but also to comply with its own internal policies.

Yet "substantial departure," as articulated in the case law, requires more than mere deviance from professional norms; contrary to intuition, courts have construed this standard to require the most wanton abandonment of caretaking responsibilities. *See Yvonne L.,* 959 F.2d at 894 ("As applied to a foster care setting we doubt there is much difference in the [deliberate-indifference and substantial-departure] standards. 'Failure to exercise professional judgment' does not mean mere negligence as we understand *Youngberg;* while it does not require actual knowledge the children will be harmed, it implies abdication of the duty to act professionally in making the placements."); *Connor B.,* 771 F.Supp.2d at 162 n. 4 ("It is far from obvious ... that the professional judgment standard creates an appreciably lower hurdle for plaintiffs [than the deliberate indifference standard].").

With this is mind, it is not clear that the Defendants' behavior has sunk to a level warranting injunctive relief. For example, when it comes to the rate of maltreatment in foster care, it is true that the Commonwealth lays claim to myriad dubious distinctions. *See, e.g.,* Child Maltreatment 2010, at 57 tbl. 3–20; Child Maltreatment 2011, at 55 tbl. 3–15 (reporting that Massachusetts is consistently in the bottom quartile of all states in its performance on the metric of absence of maltreatment in foster care). These data do not reveal the entire picture, however. In 2008—the year in which Massachusetts garnered its lowest percentage absence of maltreat-

**42.** Technically, the First Circuit did apply the deliberate indifference standard in the foster care context in *J.R. v. Gloria,* 593 F.3d at 80–81. Judge Ponsor, however, convincingly articulated various reasons why that case is sufficiently distinguishable from the one at bar. *See Connor B.,* 771 F.Supp.2d at 162 n. 5.

ment, 98.93%—the Commonwealth missed the 99.68% national standard by just three-quarters of a percent, and in recent years, the Commonwealth has been within half of a percentage point of the benchmark. *See* Child Maltreatment 2010, at 57 tbl. 3–20; Child Maltreatment 2011, at 55 tbl. 3–15. What is more, since at least 2006, less than 50% of all reporting states have made the cut, and most of Massachusetts's higher-ranked peers beat out the Commonwealth by mere fractions of a percent. *See* Child Maltreatment 2010, at 57 tbl. 3–20; Child Maltreatment 2011, at 55 tbl. 3–15. Such slight differences in position, in conjunction with the fact that the majority of states fail to meet the national standard, do not sufficiently serve to indict the Massachusetts foster care system. Moreover, although DCF was not able to prevent maltreatment from occurring, it acted reasonably when such events took place by removing the foster child from the harmful environment. See, e.g., CRC Study tbl. 18 (noting that roughly 5% of the children in the entry cohort sample population experienced substantiated instances of abuse or neglect and that approximately 91.6% of such children were removed); *id.* tbl. 45 (noting that roughly 4.1% of the children in the two-year cohort sample population experienced substantiated instances of abuse or neglect and that 80% of said children were removed).

These considerations must be taken into account in the course of determining whether the Commonwealth's subpar performance violates substantive due process, but the Defendants ought not view this opinion as encouragement to take excessive pride in the Department's performance relative to the national standard or other state foster care systems. The Court is particularly troubled by the way DCF manipulates and presents relative performance data in its internally distributed CFSR scorecards. *See, e.g.,* CFSR Scorecards, Tab September 30, 2012; *see also* Trial Tr. vol. 14, 77:21–80:11 (clarifying the Department's method of determining grades); discussion *supra* Part II.I (discussing the CFSR scorecards in the context of DCF's accountability systems). In the most recent iteration of the scorecards submitted in evidence, CFSR Scorecards, Tab September 30, 2012, the grading system employed is misleading, to say the least. The scorecards use letter grades to evaluate DCF's performance on various metrics, presumably because letter grades are recognizable and easily understood signifiers of performance. But a system that awards an A+ letter grade to a level of performance falling just short of the national median, *see, e.g.,* CFSR Scorecards, Tab December 31, 2011, at DCF011158648 (awarding, on the measure "C1.2: Median Time to Reunification," an A+ for the state's performance relative to the median), does not line up with any conventional understanding of the letter grading system or what an A+ typically signifies. While it is understandable that the Department strives to present performance data in a way that is not unduly discouraging and that makes it easy to identify areas in the most need of improvement, *see* Trial Tr. vol. 14, 74:7–19, 76:23–77:12, the current scorecards accomplish these goals at the expense of clarity and honesty. The potential for such a grading system to breed complacency in the Department is not a constitutional violation, nor does it shock the conscience, but it very poorly serves the foster children under the Commonwealth's care.

In truth, financial and administrative constraints—not the alleged mismanagement by DCF officials—pose the greatest threat to children in the Massachusetts foster care system today. In the face of budget cuts for the 2011 fiscal year, DCF reduced the number of its regional offices,

**162**

and reduced the number of management teams for the existing 29 area offices. *See* McClain Dep. 146:1–23. This has led to a scarcity of available foster care placements, *compare* Gambon Oct. Dep. 94:12–95:12 (indicating that DCF's general goal is to maintain a pool of around 4000 unrestricted homes for foster care placements), *with* DCF Quarterly Reports, 2008–2012, Tab Q3 2012, at 62 fig. 28 (showing that since 1998, the pool of unrestricted homes has consistently fallen short of 4000), staffing deficits, *see, e.g.,* Gambon Oct. Dep. 50:9–51:7, limited training, *see, e.g.,* DCF FY2012 Progress Report DCF007413695, and delay in achieving longstanding objectives, *see, e.g.,* 15 Families Initiative Presentation DCF010275220–21, DCF010275224.

Notwithstanding these challenges, certain areas have been improving. For example, DCF records show that although caseload ratios continue to exceed 18:1, steady progress has been made over the past five years, even after the reduction in regional offices from six to four. *Compare* Caseloads Reports, Tab June 2008, at 57 (reporting that as of June 30, 2008, 1034 social workers across six regional offices and a special investigations unit had weighted workloads of over eighteen cases), *with id.* Tab August 2012, at 11 (reporting that as of August 31, 2012, 390 social workers across four regional offices had weighted workloads of over eighteen cases).

Upon this mixed record, this Court respectfully declines to substitute its judgment for that of duly elected Massachusetts lawmakers, who properly are endowed with the power to direct the reserves of the Commonwealth's coffers to whatever issue of public import that they see fit. Alas, the Plaintiffs must face the sobering reality that in this particular instance, the pen is not quite as mighty as the purse.

 The "shocks the conscience" prong of the test proves equally unavailing to the Plaintiffs; even if this Court were to have concluded that DCF practice did indeed substantially depart from professional judgment, there is little in the present record that could be said to have shocked the impressionable conscience of the Court. "The burden to show state conduct that 'shocks the conscience' is extremely high, requiring 'stunning' evidence of 'arbitrariness and caprice' that extends beyond '[m]ere violations of state law, even violations resulting from bad faith' to 'something more egregious and more extreme.'" *J.R.,* 593 F.3d at 80 (alteration in original) (quoting *DePoutot v. Raffaelly,* 424 F.3d 112, 119 (1st Cir.2005)). While the actions (or inaction) of some resident bad actors reflects poorly on DCF, clear *institutional* failings at the Department have not yet been proven. *Cf., e.g., id.* at 80–81 (holding that two social workers' failure to perform background checks on men living in a foster home who allegedly sexually abused the plaintiffs, while perhaps a violation of state law, "d[id] not amount to inherently egregious conduct," *id.* at 81); *K.H.,* 914 F.2d at 853 (concluding that "a general practice of shuttling children among foster parents" was not enough to assign liability for a violation of substantive due process, *id.* (emphasis omitted)).

To be sure, DCF's management of foster care has been less than stellar, and some of the circumstances in which children in DCF's custody have been placed give the Court considerable pause. Of particular note are the harrowing accounts of the Named Plaintiffs and others in this case. But the Plaintiffs have not succeeded in showing that the deprivations complained of were felt *class-wide. See, e.g.,* Trial Tr. vol. 2, 115:13–15 (revealing that Dr. Bellon-

ci had reviewed only three case files in consideration of his expert report); Trial Tr. vol. 7, 84:23–85:1 (revealing that Dr. Azzi–Lessing had reviewed only five case files before drafting her expert report). DCF may have failed the Named Plaintiffs, but without more, their accounts do not support a ruling that DCF's system-wide practices shock the conscience.

## D. Familial Association

■ The Supreme Court has held that the First Amendment's right to association, the Ninth Amendment's reservation of unenumerated rights to the people, and the Fourteenth Amendment's rights to due process and equal protection imply a concomitant right to familial association. *See, e.g., Roberts v. U.S. Jaycees,* 468 U.S. 609, 618–20, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984) (First Amendment); *Stanley v. Illinois,* 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972) (Ninth and Fourteenth Amendments). Nevertheless, "[w]hile the Supreme Court has recognized an abstract fundamental liberty interest in 'family integrity,' the Court has never found that interest to be absolute or unqualified." *Watterson v. Page,* 987 F.2d 1, 8 (1st Cir. 1993) (citing *Frazier v. Bailey,* 957 F.2d 920, 929–30 (1st Cir.1992)). A precise elaboration of the contours of this right in the foster case context has eluded many judges and led to a confused jurisprudence among the federal district circuits. *Connor B.,* 771 F.Supp.2d at 164 (collecting cases). That said, the leading inquiry centers on whether the children are provided *"any meaningful contact* with family members." *Id.* (citing *Kenny A. ex rel. Winn v. Perdue,* 218 F.R.D. 277, 296 (N.D.Ga. 2003)).

■ The Defendants maintain that the Plaintiffs have failed to prove that "the actions of DCF's leadership are directly aimed at their [familial] relationships, with knowledge that the conduct will adversely affect those relationships." Defs.' Mem. 10. To support this proposition, the Defendants favorably cite *Cortes–Quinones v. Jimenez–Nettleship,* 842 F.2d 556, 563 (1st Cir.1988), and *D.G. v. Yarbrough,* No. 08–CV–074–GKF–FHM, 2011 WL 6009628, at *16 (N.D.Okla. Dec. 1, 2011). *See* Defs.' Mem. 10–11. Neither of these two cases is particularly apposite, however, because their underlying rationales stem from actions that ultimately sought damages. *See Cortes–Quinones,* 842 F.2d at 563–64; *D.G.,* 2011 WL 6009628, at *16 (relying for its foundation on *Griffin v. Strong,* 983 F.2d 1544, 1548–49 (10th Cir.1993), in which the plaintiffs sought damages, including punitive damages, *id.* at 1545). Courts have wider latitude to impose a remedy when asked to enter only injunctive relief. *See K.H.,* 914 F.2d at 854 (surmising that "there might . . . be broader liability in an injunctive suit against [state] officials").

■ Still, one must view the Plaintiffs' familial association claim through the lens of substantive due process, as the former is derived in whole or in part from the latter. *See Gonzalez v. City of Anaheim,* 715 F.3d 766, 772 (9th Cir.2013) (treating an action for familial association as a substantive due process claim requiring proof of conscience-shocking behavior); *P.J. ex rel. Jensen v. Wagner,* 603 F.3d 1182, 1198 (10th Cir.2010) (exercising the court's authority to resolve "claims regarding [the] substantive due process right to familial association"). To be sure, Massachusetts's performance with respect to familial visitation and placement is far from excellent. *See,* e.g., CRC Study tbl. 16 (observing that just 20.9% and 37.6% of children in the entry cohort received monthly visits from siblings and parents,

respectively, for the entirety of the thirty-month review period). *Compare* First–Round CFSR Final Assessment CSF–000000331–34 (finding Massachusetts's efforts in kinship placements and familial connections to be in substantial conformity with federal law during the first-round CFSR), *with* Second–Round CFSR Final Report CSF–000000780–91 (finding performance on said measures to be out of step with federal mandates). Yet in light of this Court's earlier discussion of substantive due process, *see supra* Part III.C, one must take into account the extenuating circumstances (i.e. budgetary constraints) that bear on DCF's capacity to deliver high-quality care in order to determine whether the children in foster care were deprived of meaningful opportunities to see their family members. Here the Plaintiffs fail to prove there is such class-wide institutional deprivation.

### E. Procedural Due Process

■ In evaluating claims for violations of procedural due process, courts are instructed to engage in a two-step analysis that requires a determination of (1) "whether there exists a liberty or property interest which has been interfered with by the State," and if so, (2) "whether the procedures attendant upon that deprivation were constitutionally sufficient." *González–Fuentes v. Molina*, 607 F.3d 864, 886 (1st Cir.2010) (quoting *Kentucky Dep't of Corrections v. Thompson*, 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989)) (internal quotation marks omitted).

■ The Plaintiffs, in their complaint, claim entitlements under state law to the following four putative rights:

a. The rights in relation to "placement of children in private families; early and periodic screening, diagnostic and treatment standards; individualized health care plan" . . .;

b. The right to a "medical passport" . . .;

c. The rights to sibling visitation . . .; and

d. The right to be considered for placement with relatives, other adult persons who have played significant positive roles in the child's life, and any minor siblings or half-siblings . . . .

Compl. ¶ 309(a)-(d) (internal citations omitted); *see also* Pls.' Opp'n 17. The Defendants deny that the Plaintiffs can enjoy such rights. Defs.' Mem. 13. For the reasons stated with respect to the Plaintiffs' other putative rights, *see supra* Part III.C, this Court endorses the Plaintiffs' view.

■ Notwithstanding the acknowledgement of constitutionally protected interests, the Plaintiffs have failed to establish that the Defendants acted in a constitutionally deficient manner. It may be unclear whether notice of suspended services is always provided, *see, e.g.,* Peel Dep. 84:24–85:22, but one cannot prove the negative from an empty inference. Furthermore, once again, limited resources appear to be the properly attributable culprit, as former Commissioner McClain noted in his deposition that budget cuts contributed to overwhelming backlogs in the scheduling of fair hearings. *See* McClain Dep. 146:7–148:14. Finally, the data drawn from the CRC study on foster care reviews and permanency plan hearings, CRC Study tbls. 20a & 47a, are not especially helpful because there is no comparative data available to the Court to contextualize CRC's findings. Accordingly, the Plaintiffs have

not demonstrated that a constitutional deprivation deserving redress exists.

### F. Statutory Claims under the AACWA

#### 1. Foster Care Maintenance Payments

■ The Plaintiffs seek relief for DCF's failure to distribute foster care maintenance payments at USDA-recommended levels as prescribed by law. *See* Compl. ¶ 307; *see also* 42 U.S.C. § 672(a)(1); Mass. Gen. Laws ch. 119, § 23(h). Since March 2012, however, DCF's foster care maintenance rates have been commensurate with those set by the USDA. *See* McClain Dep. 150:18–151:3. The Plaintiffs contend that this fact alone does not effectively moot their claim. For support, the Plaintiffs point to the Department's long history of providing insufficient foster care maintenance payments. *See* Pls.' Opp'n 15–16; *see also* Sept. 28 McClain Letter DCF000827080 (reporting that, for some number of years, DCF rates ranged between 17% and 24% below the USDA rates).

■ Generally speaking, in order to remain eligible to receive federal funds under the AACWA, a state must comply strictly with conditions attached to the receipt of those funds. *California Alliance of Child & Family Servs. v. Allenby*, 589 F.3d 1017, 1022 (9th Cir.2009). Substantial compliance with said conditions, however, is acceptable in certain instances prescribed by federal regulation. *Id.* at 1022–23 (citing, *e.g.*, 45 C.F.R. §§ 1355.39, 1356.71(c)(5)).

DCF's past performance with respect to foster care maintenance payments failed strictly (or even substantially) to comply with the AACWA. *See id.* at 1021 (holding that the payment of 80% of foster care costs "runs afoul of the [AACWA's] mandate"). The problem here, however, is

that the Plaintiffs seek only *prospective* injunctive relief. The Court acknowledges the cash flow challenges facing foster parents and recognizes that foster care recompense payments, while providing money downstream, does little for the children who are in need of that money now. The fact remains, however, that as of March 2012, foster care maintenance rates satisfy USDA requirements. *See* McClain Dep. 150:18–151:9.

Notwithstanding the prospective relief sought, the Plaintiffs claim that the Department's recent fix is inadequate, given its less-than-assured commitment to sustain foster maintenance rates at USDA levels going forward. *See* Pls.' Opp'n 16; Trial Tr. vol. 15, 110:20–111:5; Trial Tr. vol. 12, 23:15–17. Once again, however, the Plaintiffs fall victim to blaming the wrong party for their plight. Although DCF is statutorily obligated to set the rates for foster care maintenance payments at levels prescribed by the USDA, *see* Mass. Gen. Laws ch. 119, § 23(h), the Massachusetts legislature is ultimately responsible for appropriating the funds needed to ensure that DCF is able to reach these goals, Trial Tr. vol. 15, 107:17–108:3. The serendipitous nature of DCF's receipt of $12,000,000 from the state government to raise its foster care maintenance rates in line with those set forth by the USDA is of no moment in this case. It is not for this Court to speculatively cast aspersions on the present or future intentions of state bureaucrats.

This holding ought not be read to give the Defendants a free pass to make an end run around the requirements set forth in the AACWA, however. Should foster care maintenance rates fall substantially below USDA guidelines in the coming months or years, the Plaintiffs are free to resume the

pursuit of what will be deemed by this Court to be a revived and actionable claim. *See, e.g., Conservation Law Found. v. Patrick,* 767 F.Supp.2d 260, 261 (D.Mass. 2011).

### 2. Case Plans

The Plaintiffs argue that the Defendants are neither fully nor substantially in compliance with the case-planning requirements established by the AACWA. Pls.' Opp'n 16.

 The results from the CRC study suggest that case plans are generally not well maintained and, in some cases, are entirely unavailable for review. *See* CRC Study tbls. 28a & 55a (reporting that 14.6% of children in the entry cohort and 35.1% of children in the two-year cohort were missing case plans in their case files); *id.* tbl. 29 (reporting, with respect to the entry cohort, that 65.8% of the case plans contained child service data and that 73.9% of the case plans contained family service data); *id.* tbl. 56 (reporting, with respect to the two-year cohort, that 31.8% of the case plans contained child service data and that 10.7% of the case plans contained family service data). Without more, however, mere gaps in record keeping hardly constitute grave statutory error, *cf. Bailey v. Pacheco,* 108 F.Supp.2d 1214, 1223 (D.N.M.2000) (observing, *inter alia,* that "[s]loppy record keeping skills" did not cause social worker to relinquish the trappings of presumptively valid professional judgments), particularly when viewed in the context of the financial and administrative hardships that have been discussed above, *see supra* Part III.C. Accordingly, the Plaintiffs' AACWA claims founded

upon DCF's lackluster maintenance of *case plans* cannot survive.

## IV. CONCLUSION

For the foregoing reasons, on September 30, 2013, this Court GRANTED the Defendants' motion for judgment on the record, ECF No. 316.

This is a dispiriting opinion to write. In alleging violations of substantive due process, the Plaintiffs set themselves to climb a virtually unscalable peak. They have failed in the ascent. Nothing is really resolved. The state defendants today avoid the litigation bullet but the stage is set for further costly litigation as all attempts at settlement have failed.

In the process, the Court may have done a disservice to the hundreds of overworked, underpaid, and underappreciated case workers and foster home providers whose dedication has never been questioned here. There is, of course, a certain aridity in marshalling the statistics necessary to sustain or refute the class-wide institutional claims made in this case.

Yet this is not a case about statistics but about children—our children—and this much is clear, the flaws noted herein are more about budgetary shortfalls than management myopia. We are all complicit in this financial failure.

When next you bemoan your tax burden, remember that, at that moment, somewhere in Massachusetts there is a youngster who has just been taken from her parents' home.[43] She is confused, inexpressibly lonely, homesick, and desperately afraid. Because of Massachusetts' penury,

---

**43.** There is no suggestion in this record that Massachusetts overreacts in taking children

into foster care.

her future is murkier than in most places in America.

Do you care?